AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

ORIGINAL
RECEIVED AND FILED
UNITED STATES DISTRICT COURT CLERK
WESTERN DISTRICT OF NEW YORK

# UNITED STATES DISTRICT COURT
for the

Western District of New York

AUG 2 7 2015

BY:

In the Matter of the Seizure of
*(Briefly describe the property to be seized)*
Contents & Monies in Bank of America Acct. No.
483040498448 First Niagara Acct. No. 7900244836,
and Key Bank Acct. No. 327831000606

)
)
)
)
)

Case No.  *15-MC-61*

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Western_____ District of
_____New York_____ is subject to forfeiture to the United States of America under ____18____ U.S.C. §
_981 and 982_  *(describe the property)*:
Contents and monies and contents contained within Bank of America Acct. No. 483040498448 held in the name of NY IOLA Trust Accts, Frank R Parlato Trustee;  First Niagara Acct. No. 7900244836 held in the name of Frank Parlato IOLA Fund of the State of NY, and Key Bank Acct. No. 327831000606 held in the name of Frank R Parlato IOLA Fund Attorney Escrow Account/IOLA

The application is based on these facts:
The bank accounts are subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and (b) and Title 21, United States Code, Section 853(f) for a violation of Title 18, United States Code, Sections 1956(h) and 1957 and Title 18, United States Code, Sections 371 and 1343.  The facts to support a finding of probable cause for issuance of the seizure warrants are set forth in the attached affidavit.

☑ Continued on the attached sheet.

_Applicant's signature_

Brian A. Burns, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _August 27, 2015_

City and state:  Buffalo, New York

_Judge's signature_

H. Kenneth Schroeder, Jr., U.S. Magistrate Judge
*Printed name and title*

Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

IN RE: THE MATTER OF SEIZURE WARRANTS FOR:

CONTENTS AND MONIES CONTAINED WITHIN
**BANK OF AMERICA** ACCOUNT NO. 483040498448
HELD IN THE NAME OF NEW YORK IOLA TRUST
ACCOUNTS, FRANK R PARLATO TRUSTEE,
HAVING AN APPROXIMATE BALANCE
OF $132,000 UNITED STATES CURRENCY,

CONTENTS AND MONIES CONTAINED WITHIN
**FIRST NIAGARA BANK** ACCOUNT NO. 7900244836
HELD IN THE NAME OF FRANK PARLATO IOLA
FUND OF THE STATE OF NEW YORK, HAVING AN
APPROXIMATE BALANCE OF $460,986.32
UNITED STATES CURRENCY,
and

CONTENTS AND MONIES CONTAINED WITHIN
**KEY BANK** ACCOUNT NO. 327831000606
HELD IN THE NAME OF FRANK R PARLATO IOLA
FUND ATTORNEY ESCROW ACCOUNT/IOLA, HAVING
AN APPROXIMATE BALANCE OF
$407,250.23 UNITED STATES CURRENCY.

---

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEIZURE WARRANTS**

STATE OF NEW YORK   )
COUNTY ERIE          )   ss:
CITY OF BUFFALO      )

I, **BRIAN A. BURNS,** having been duly sworn, states as follows:

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation
("FBI").  I have been employed as a SA since 1998, and since 2008, I have been assigned to
the Buffalo Field Office White Collar Crime Squad which investigates white collar crimes as
well as public corruption matters.  The FBI is an agency within the United States

Department of Justice, which is a department within the Executive Branch of the United States Government.

2.      I am a federal law enforcement officer within the meaning of federal law and the Federal Rules of Criminal Procedure, including Fed.R.Crim.P. 4 and 41; that is, a government agent who is engaged in enforcing the criminal laws of the United States and is within a category of officers authorized to request search and seizure warrants, to apply for criminal complaints and execute arrest warrants, and to make arrests.

### INTRODUCTION

3.    This affidavit is made in support of an application for criminal and civil seizure warrants for the contents and monies contained within the three (3) "Interest on Lawyers Accounts" (IOLA accounts) listed below, which are proceeds of money laundering and money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(h) and 1957 and which are proceeds of a specified unlawful activity, to wit: wire fraud in violation of Title 18, United States Code, Section 1343, thereby subjecting the financial accounts to seizure and forfeiture pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and (b)  and Title 21, United States Code, Section 853(f). The monies and contents subject to this warrant application are located in accounts as follows:

    a.      BANK OF AMERICA ACCOUNT NO.  483040498448
            HELD IN THE NAME OF NEW YORK IOLA TRUST
            ACCOUNTS, FRANK R PARLATO TRUSTEE

    b.      FIRST NIAGARA BANK ACCOUNT NO. 7900244836
            HELD IN THE NAME OF FRANK PARLATO IOLA
            FUND OF THE STATE OF NEW YORK and

    c.    KEY BANK ACCOUNT NO. 327831000606
            HELD IN THE NAME OF FRANK R PARLATO IOLA
            FUND ATTORNEY ESCROW ACCOUNT/IOLA

4.    The facts set forth in this affidavit are based upon my own personal knowledge; knowledge obtained from other individuals, including law enforcement officers; my review of documents of law enforcement activities related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; the review of transcripts of testimony given to the grand jury; and information gained through my training and experience. While the information I will now relate is substantial, I have not presented each and every fact of this investigation to date and have only provided information necessary to establish probable cause for issuance of the seizure warrants.

## OVERVIEW

5.    The information set forth below establishes probable cause to believe that Frank Parlato Jr. ("PARLATO"), engaged in numerous wire fraud schemes while stealing money from his business partners, the late LR and DH, totaling more than approximately $1,000,000. These monies were derived from the operations of a parcel of real estate located in Niagara Falls known as the One Niagara Building hereafter referred to as THE PROPERTY.

6.    PARLATO, in furtherance of the aforementioned wire fraud schemes, moved funds through an extensive number of bank accounts with the purpose of shielding the monies from potential and actual creditors, including civil litigants, LR, DH and the IRS.

PARLATO used an array of corporate and partnership business entities to open bank accounts which often was the sole activity of the entity.   Investigation identified approximately seventeen (17) business entities and approximately (forty-nine) 49 bank accounts which, for the most part, were predominantly created and utilized from 2006 to Summer 2014.   PARLATO used these business entities, the majority of which existed simply as shell companies, to transfer funds in a complex and convoluted series of financial transactions which lacked any discernible business purpose, deliberately commingling funds and clouding and obfuscating any attempt at civil recovery.   These transfers resulted in extensive money laundering activities.

7.       These transfers included the movement of funds into the three (3) separate IOLA bank accounts which are the subjects of this seizure warrant application. Each of these accounts were established as IOLA accounts.   IOLA accounts are defined as Interest on Lawyer Account.   Such accounts are established, by attorneys, to hold funds in a fiduciary capacity for clients.   Despite Frank PARLATO not being an attorney (his 89 year old father is an attorney), he had signature authority for these accounts.   PARLATO transferred these funds and has control over these IOLA accounts as a method to further shield recovery.

8.       PARLATO was assisted in these schemes by his associate and co-conspirator CHITRA SELVARAJ (SELVARAJ). SELVARAJ was a co-signer on nearly all of the bank accounts involved and conducted a large amount of the banking activity. SELVARAJ also oversaw the parking lot located upon THE PROPERTY, which was a lucrative source of

cash revenue. Witnesses interviewed established that SELVARAJ was involved with the operations of THE PROPERTY and fully aware of all PARLATO's financial activities.

9.     Proceeds from the aforementioned illegal activities which totaled more than approximately $1,000,000 eventually were deposited into the three (3) IOLA accounts which are subject of this seizure warrant application.

## ONE NIAGARA BUILDING (THE PROPERTY)

10.     LR invested $2,200,000 in September of 2000 in a project identified as "Aqua Falls," which was a proposed underground aquarium that was to be built on THE PROPERTY. The project ultimately failed due to the inability of investors, including original developer DH, to secure sufficient financing. Initial development resulted in a large hole having been dug on the property. DH held the first mortgage/lien against the project and eventually, LR began action in 2004 to foreclose on his second position $2,200,000 mortgage/lien.

11.     An attorney who represented DH advised that in 2004, after LR moved to foreclose on his mortgage/lien against THE PROPERTY, DH came to the area to address the situation and met with local attorney GD who introduced DH to PARLATO. GD represented that PARLATO was a big money investor who could help him. PARLATO indicated that he would put $4,000,000 capital into the project. Two million dollars was to be used to buy LR out of the project and the other $2,000,000 would be for improvements. In fact, PARLATO did not invest any of his own money into THE PROPERTY.

12.     As a consequence of DH accepting PARLATO's offer, PARLATO, d/b/a WHITESTAR DEVELOPMENT CORPORATION (WHITESTAR), and DH, d/b/a INCREDIBLE INVESTMENTS LIMITED formed ONE NIAGARA, LLC. PARLATO, d/b/a WHITESTAR held a 51% interest in ONE NIAGARA LLC. DH's entity INCREDIBLE INVESTMENTS LIMITED held the remaining 49%. PARLATO established himself as the "initial sole manager" based on the terms of the agreement. Consequently PARLATO, d/b/a ONE NIAGARA, LLC then had complete discretion to engage in any activity which would earn revenues from THE PROPERTY.

13.     As sole manager PARLATO was required, pursuant to the agreement, to be transparent with DH about the finances related to the operations of THE PROPERTY. PARLATO never honored this portion of the agreement, continually thwarting DH's efforts at securing transparency. In 2007 DH's representative attempted to intercede at THE PROPERTY on DH's behalf because of PARLATO's actions. PARLATO individually and as President of WHITESTAR DEVELOPMENT CORPORATION and Manager of ONE NIAGARA LLC commenced litigation by seeking injunctive relief against DH and his representatives in August 2007. In 2009, federal civil litigation was initiated by INCREDIBLE INVESTMENTS LIMITED against PARLATO, and other related individuals and entities resulting in extensive civil litigation against PARLATO which he (PARLATO) opposed. In addition, as the sole manager, PARLATO could decide if cash disbursements could be made from revenue generated in excess of what was needed for the operations of ONE NIAGARA LLC. These disbursements would be to the members of ONE NIAGARA LLC, (PARLATO and DH) based on their percentage of ownership. Evidence establishes that PARLATO later diverted significant revenues generated from the operations of THE PROPERTY but never

6

shared or disclosed any of these proceeds with DH or his entities.  (See Exhibit "A1", Page 8, ARTICLE VII Distributions of Cash and Page 12, ARTICLE XI Books and Reports).

14.     As the events described above were unfolding, PARLATO also met with LR, who had begun a foreclosure proceeding against ONE NIAGARA LLC.  In an effort to induce LR to stop his foreclosure action, PARLATO outlined a business plan to make THE PROPERTY a profitable venture.  Additionally, PARLATO agreed to take possession of the LR mortgage and signed a promissory note, dated December 7, 2004, on behalf of his company WHITESTAR, in the amount of $1.4 million thus assuming LR's $2,200,000 mortgage/lien against THE PROPERTY.  The agreement provided that if PARLATO failed to satisfy the terms, then LR still held his interest in THE PROPERTY as collateral. The promissory note called for interest payments beginning May 7, 2005, with the entire balance due on December 7, 2005.  PARLATO failed to make any of the required interest payments, and did not pay the balance by December 7, 2005 as required by the terms of the promissory note. (See Exhibit A2) .

15.     LR, who died in March of 2015, was interviewed and advised that in 2006, PARLATO approached him about a new joint venture which would produce income at THE PROPERTY.  In part, the plan called for ONE NIAGARA, LLC to take responsibility for paying expenses of the building, to include real estate taxes, utilities and building maintenance. Additionally, PARLATO would oversee the installation of a parking lot after filling in the large hole left after the failure of the Aqua Falls project.  The parking lot would serve the dual purpose of generating parking revenues as well as allowing

PARLATO to rent space at the building to vendors, who would sell souveniers, food, and tour packages to tourists. In an attempt to salvage his investment, LR agreed to partner with PARLATO in this new joint venture. To that end, LR agreed to financially support PARLATO in the endeavor, since PARLATO did not have the capital necessary for the project. LR reviewed PARLATO's analysis and income projections and felt that the plan looked viable.

16.    Their understanding resulted in LR and PARLATO executing an Operating Agreement, dated April 14, 2006. The agreement resulted in PARLATO, d/b/a FP INC, and LR, dba RH NIAGARA BUILDING LLC, establishing a new "Company" identified as TOURIST SERVICES, LLC. (TOURIST SERVICES). Both LR and PARLATO's entities held a 50% interest in this new venture. As part of the Operating Agreement, LR would not pursue foreclosure against his original investment in THE PROPERTY. The Operating Agreement specified that a Mandatory Distribution in the amount of $200,000 would be paid to LR each calendar year, commencing with the year ending December 31, 2008. The Agreement specified that PARLATO would be the "President of the Company to handle the day-to-day affairs of the Company." Pursuant to the Agreement, as the President of the Company, PARLATO was required to be transparent with finances related to the operations of THE PROPERTY. PARLATO never honored this portion of the agreement, continually thwarting LR's efforts at securing transparency. PARLATO ultimately removed at least $1,475,233 in revenues generated from the operations of THE PROPERTY but never informed or shared any of these proceeds with LR. (See Exhibit "A", Page 4, ARTICLE III DETERMINATION OF NET INCOME AND NET LOSS

3.1, 3.5; Page 5, ARTICLE IV MEMBERSHIP RIGHTS AND INTERESTS 4.1; Page 8,

ARTICLE VI DISTRIBUTIONS 6.1; Page 8, ARTICLE VII TAXES 7.1) .

17.     On the same day as the aforementioned Operating Agreement was executed,

TOURIST SERVICES signed a Lease Agreement with ONE NIAGARA, LLC, which was

then modified on June 11, 2007. (Exhibit "B"). This Lease Agreement effectively permitted

TOURIST SERVICES to implement PARLATO's business plan intended to make THE

PROPERTY a profitable venture.   Additionally, it required TOURIST SERVICES to pay

rent in the amount of 25% of its gross revenues to ONE NIAGARA, LLC.  The remaining

75% of revenues would be retained by TOURIST SERVICES. As previously noted, DH and

PARLATO had created ONE NIAGARA, LLC in 2004 and PARLATO held a controlling

interest.  As a result, PARLATO was the landlord in the lease agreement with TOURIST

SERVICES.  DH later alleged in a civil suit that PARLATO violated their joint agreement

by setting up TOURIST SERVICES without his (DH's) permission to receive money that

was owed to ONE NIAGARA, LLC.

18.     At the same time, as a consequence of establishing TOURIST SERVICES,

LR agreed to loan an additional $500,000 to TOURIST SERVICES.  These funds were used

to install the parking lot (fill in the hole) and make necessary repairs and improvements to

THE PROPERTY.  This $500,000 loan, provided to TOURIST SERVICES, was eventually

paid back in late 2007.

19.     After PARLATO began operating THE PROPERTY and generating revenue

from parking and vendors, he (PARLATO) was not transparent with LR about what

9

revenues were coming in and, as the evidence shows, engaged in conduct designed to conceal and obfuscate TOURIST SERVICES' day-to-day activity from Reger and the professionals Reger hired to oversee his businesses. Indeed, most of TOURIST SERVICES' revenue came in the form of cash. DH's representatives began civil litigation in 2009 against PARLATO and related entities attempting to get what was owed to DH based on his agreement with PARLATO. As a result of PARLATO's refusal to provide details pursuant to civil discovery demands for revenues and expenses from THE PROPERTY, State Supreme Court Justice Frank Caruso appointed an onsite agent to attempt to observe what revenues were actually being generated. The onsite agent was a DH representative (KM) who subsequently determined annual revenues, in the millions of dollars were being generated at THE PROPERTY.

20.    PARLATO failed to pay the initial Mandatory Distribution of $200,000 due to LR on December 31, 2008. At the same time, the $1.4 million promissory note remained unpaid.

21.    In late December 2009, PARLATO made LR's 2009 Mandatory Distribution in the amount of $200,000. This check represents the only distribution that PARLATO made pursuant to the terms of the Agreement from the beginning of TOURIST SERVICES on April 14, 2006 to the time PARLATO sold his interest in the business. This payment coincided with and was likely a consequence of LR threatening a lawsuit for PARLATO's failure to abide by the terms of their Agreement.

10

## EVIDENCE OF PARLATO's EFFORTS TO CONCEAL REVENUE

22.    LR advised that PARLATO was asked "dozens of times" by his (LR) representative, DS, for financial statements relating to the operations of THE PROPERTY. Each time PARLATO responded, in sum and substance, that he would provide them, yet he continuously failed to do.  LR was unaware of any of the funds PARLATO stole from him due to the fact PARLATO was never transparent with THE PROPERTY's financials.

23.    DS held the position of Controller for LR's entities.  As a result of the formation of TOURIST SERVICES along with the infusion of the $500,000 loan discussed in paragraph 18 of this affidavit, LR directed DS to get a handle on the cash flow from the TOURIST SERVICES operations.  Consequently, DS became acquainted with PARLATO and SELVARAJ.  In an effort to accomplish this task, DS periodically traveled to THE PROPERTY and began dealing with PARLATO and SELVARAJ.

24.    DS initiated efforts to understand the TOURIST SERVICES business operations and associated internal controls that were being used by PARLATO and SELVARAJ.  DS also attempted to assist them in establishing the use of a Quick Books/accounting program.  This program was proposed and was used for a short time to help provide order and transparency to the books and records of the company.  DS provided a Quick Books program and trained SELVARAJ on its use shortly after the execution of the April 2006 Toursist Services Agreement.  She initially used the accounting program, but discarded its use soon after its implentation.

25.    DS advised his efforts to work with PARLATO and SELVARAJ were met with resistance and limited cooperation.  SELVARAJ was his primary contact and while

11

she seemed capable, she failed to implement controls or the accounting program that DS had provided.    DS could never get comfortable with the accounting provided by SELVARAJ and PARLATO.  The fact that a large portion of the business revolved around taking in cash from tourists and vendors without reliable accounting methods left him very uneasy about whether he was receiving accurate and reliable information.

26.    DS reviewed a series of his emails from 2006 concerning his efforts in dealing with TOURIST SERVICES and recalled the constant sense of frustration he experienced in attempting to obtain accurate financial information from SELVARAJ.  DS recalled that at one point he had access to the online bank accounts of TOURIST SERVICES but sometime in July 2006, the password to the online bank records had been changed, which prevented him from having further access.  DS noted that when he had access to the bank records, it was clear that enough cash existed to pay various outstanding LR obligations and maintain operations.

27.    PARLATO clearly shifted operational activity between various companies and bank accounts during the investigative period, a fact which SELVARAJ admitted during a civil deposition.  SELVARAJ testified at length in civil depositions on July 7, 2009, July 16, 2009, and December 11, 2009, concerning her recordkeeping methods related to THE PROPERTY.  SELVARAJ's recordkeeping essentially consisted of putting revenue information into an Excel spreadsheet.  When the tourist season ended and SELVARAJ had the time, usually in September or October, she would transfer the Excel data to a Quicken or Quick Books computer accounting program.  However, SELVARAJ stopped using that accounting program shortly afterwards.  This was also approximate to the same

12

time DS was attempting to determine revenue being generated by THE PROPERTY. In the civil depositions, SELVARAJ testified she was solely responsible for keeping the books and records for THE PROPERTY, although she operated at all times under PARLATO's supervision.

28.   PG, an attorney and business associate of PARLATO, testified regarding the business operations of THE PROPERTY in the Federal Grand Jury (FGJ).   In response to the question "would it be fair to say that LR was demanding to see the various books and records to back this up (the fact PARLATO did not have money to pay LR his $200,000 Mandatory Distribution due on December 31, 2008)." PG testified "I believe so".   As a point of note, PG purchased Parlato's interest in THE PROPERTY on July 22, 2010.

## REVENUES AT THE PROPERTY

29.   The investigation has determined that revenues from THE PROPERTY were generated from a lucrative cash-only parking lot and tourist, souvenir and restaurant vendors who operated at THE PROPERTY. THE PROPERTY's location was in a prime tourist area in downtown Niagara Falls. Investigative efforts determined that SELVARAJ assisted PARLATO in managing the day to day operations at THE PROPERTY including, collecting cash revenue from the vendors and the parking lot.

30.   A financial analysis determined that beginning on or about April 19, 2006, PARLATO utilized an M&T Bank account #7644 (all accounts in this affidavit will be referenced with the last four digits of their account numbers) in the name of TOURIST SERVICES to deposit revenues from from the operations of the property, including tourist

13

company commission checks, ATM proceeds, cash deposits, and vendor rent checks. However, in or about January 2009, the State of New York issued a tax levy against the account which resulted in the January 29, 2009 seizure from the account in the amount of $6,284.83 to cover unpaid sales taxes, thus bringing the balance in TOURIST SERVICES account #7644 to zero. It is presently unknown how much, if any, additional sales tax liability remained after execution of the levy against the bank account. The TOURIST SERVICES account #7644 was formally closed on April 24, 2009. In April 2009, approximate to the closing of TOURIST SERVICES account #7644, the same aforementioned deposit type items consisting of revenues from THE PROPERTY began to be deposited into M&T Bank account #0702 in the name of WHITESTAR DEVELOPMENT. The ATM proceeds were deposited into this same WHITESTAR DEVELOPMENT account #0702 until approximately June 2010, as will be discussed later in this affidavit. It is notable that subsequent to the State of New York tax levy and changing of the bank accounts used to deposit revenues from THE PROPERTY, PARLATO again failed to turn over collected State of New York sales taxes. A review of New York State sales tax records revealed that beginning in the month of June 2009, PARLATO failed to file the required sales tax forms with the State of New York on behalf of TOURIST SERVICES. From June 2009 through July 2010, inclusive, TOURIST SERVICES failed to file and report sale taxes of approximately $77,457.72. PG filed these delinquent sales tax returns on or about December 16, 2010, after purchasing PARLATO's interest in THE PROPERTY.

31.     A review of bank documents and financial records reflected revenues from operation of THE PROPERTY had been deposited into multiple bank accounts.   These accounts were in the names of different entities.  For the time period 2009 and 2010, the dominant entities and accounts where revenues from operation of THE PROPERTY were deposited were as follows:

| ENTITY | BANK | ACCOUNT NUMBER | USAGE | 2009 – 2010 APPROXIMATE GROSS DEPOSITS |
|---|---|---|---|---|
| WHITESTAR | M&T Trust | 0702 | Jan. 2009 - July 2010 | $ 4,300,000 |
| ONE NIAGARA CENTER | HSBC | 6737 | June – Aug. 2010 | $ 861,500 |
| ONE NIAGARA CENTER | M&T | 2299 | July 2010 | $ 524,500 |

32.     For example, one of the tour operations, whose office was located on THE PROPERTY, was owned by TK.  TK was interviewed and explained the rent paid to PARLATO was based on a percentage of sales.  In 2008, the rate was 20 percent, and then it changed to 29 percent.  TK kept track of tour sales and provided the numbers to building management on a weekly basis.  TK estimated he made rental payments to PARLATO of approximately $200,000 in 2008, $522,000 in 2009 and $348,000 in 2010.  These rental payments were paid by check.  While a complete analaysis of TK's checks was not completed, a large portion of these checks were deposited into the WHITESTAR DEVELOPMENT account at M&T Trust account #0702, thus keeping them off TOURIST SERVICES' records.

33.     A food vendor identified as DC advised he paid rent to PARLATO in the amount of 25% of his daily gross receipts. PARLATO employed an individual who worked for him that would review the daily cash register receipts to determine each vendor's sales. DC advised that cash was a way of life at the building and that vendor payments to PARLATO or PARLATO's employees were almost always paid in cash. DC advised PARLATO did not have an official bookkeeping system and stated that "mums the word" when PARLATO deals in cash. DC estimated he made cash payments to PARLATO between $16,000 to $22,000 each year from 2008 to 2009.

34.     SELVARAJ testified at length during a deposition on July 7, 2009 in a civil proceeding concerning the revenues which included parking fees and rent payments from souvenir shops, food vendors, and tour companies. Parking rates for the 250 parking spaces varied based on the season and the amount of traffic. Food and souvenir vendors, whose operations were located in the building, paid rent in the amount of 25% of their gross revenues. Vendors outside the building paid 15% to 20%.

35.     SELVARAJ claimed during the deposition that all deposits of revenues related to THE PROPERTY went through bank accounts held by TOURIST SERVICES until 2009. SELVARAJ further testified that subsequently WHITESTAR bank accounts began to be used for that purpose. SELVARAJ testified that PARLATO did not tell her why the revenues and expenses began to be deposited to and paid by WHITESTAR in 2009, rather than from accounts held by TOURIST SERVICES or ONE NIAGARA, LLC. In addition, SELVARAJ testified that only minimal expenses were paid in cash.

16

36.     In 2007 and 2008, an attorney representing DH's interest received limited civil discovery and engaged forensic accountants (FAs) to complete a forensic analysis of revenues generated at THE PROPERTY.   FAs advised that they eventually received unfiled copies of ONE NIAGARA LLC's tax returns for 2008, 2009, and 2010, as well as other financial documents.   In addition, the FAs reviewed records from KM, the court ordered onsite agent, and drafted a letter containing certain findings, including:

> *"Total Estimated Gross Revenue" for 2008, 2009, and 2010 respectively is $2,683,000, $2,343,000, and $2,318,000"*

37.     FAs traced an extensive number of bank accounts linked to PARLATO and the operations at THE PROPERTY.  FAs could not find a legitimate reason for such a large number of bank accounts and the large number of transfers between the different bank accounts.  FAs believed that a large number of the bank transfers were deliberately being conducted to make it difficult to trace the revenue generated by THE PROPERTY.  They learned that some of the revenue they were attempting to trace was eventually transferred out of accounts under PARLATO's control and into bank accounts controlled by SELVARAJ.

38.     The use of these numerous bank accounts was further corroborated when an outside accountant was engaged to prepare the books and records for TOURIST SERVICES, WHITESTAR DEVELOPMENT CORPORATION and ONE NIAGARA in approximately 2012.  This outside accountant did not perform this work until well after Parlato's involvement in THE PROPERTY had ended.  The records, created by the outside

17

accountant, confirmed that revenues from operations of THE PROPERTY had been deposited into the accounts referenced in paragraph 31. Based on this outside accountant's work, TOURIST SERVICES revenues from operations were as follows:

| YEAR | REVENUES |
|------|----------|
| 2008 | $1,612,952 |
| 2009 | 2,333,778 |
| 2010 | 2,317,659 |

## REVENUES SKIMMED FROM OPERATONS AT THE PROPERTY

39.     While the exact amount of revenues skimmed from operations at THE PROPERTY may never be known, investigative efforts have determined PARLATO and SELVARAJ diverted revenues totaling approximately **$1,450,000**, some of which was owed to LR and/or DH, and all of which should have been disclosed to LR and DH, thus defrauding them.

40.     PARLATO and SELVARAJ knowingly structured transactions to conceal discovery of any available income by laundering the revenues through multiple entities and accounts, which they controlled. These actions aided in their efforts to avoid paying the 2008 annual Mandatory Distribution of $200,000 to LR or the repayment of the outstanding $1.4 million loan. These laundering activities also served to conceal reportable income and to avoid paying taxes.

41.     As previously noted in paragraphs 16 and 17, TOURIST SERVICES was an entity established by LR and PARLATO and the agreement called for TOURIST SERVICES to receive of 75% of the Gross Revenues from operations at THE

18

PROPERTY.  The other 25% was to be paid as rent to ONE NIAGARA, LLC, which was the entity DH and PARLATO created in 2004.  The agreements required PARLATO to be transparent with the financials of THE PROPERTY operations with both LR and DH.  In addition, PARLATO did not have the authority to make unilateral decisions regarding disbursements; instead, the agreements required that disbursements needed to be agreed upon by the partners of both TOURIST SERVICES and ONE NIAGARA LLC.

42.   Prior to PARLATO or SELVARAJ being aware of the initiation of this investigation, neither WHITESTAR DEVELOPMENT CORPORATION, ONE NIAGARA, LLC, or TOURIST SERVICES had filed federal income tax returns for the years 2008, 2009 and 2010.  PARLATO prior to being aware of the initiation of this investigation did not file any personal income tax returns for the years 2008, 2009 and 2010.  SELVARAJ prior to being aware of the initiation of this investigation did not file any personal income tax returns for the years 2009 and 2010.

## SUMMARY OF TEN (10) TRANSACTIONS WHICH TOTAL $1,475,223

43.   The investigation has identified 10 (ten) transactions where money is transferred from the operations of THE PROPERY to other accounts held and controlled by PARLATO and SELVARAJ.  The first 6 (six) transactions occurred during 2009 at the time LR was owed his 2008 annual $200,000 Mandatory Disbursement.  These transfers are from M&T Bank account #0702 in the name of WHITESTAR DEVELOPMENT.  As previously noted in paragraph 30, starting in April of 2008, revenue from THE PROPERTY began being deposited into M&T Bank

account #0702.   SELVARAJ testified that revenues from THE PROPERTY were deposited into the WHITESTAR bank account in 2009 rather than the TOURIST SERVICES bank account.   LR had no idea these transfers had taken place.   Additional information concerning these transfers will be more fully outlined later in this affidavit.

**$200,000**  Transferred August 6, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to Citizen's Bank Account #7024 in the name of DAYTON INGERSOLL.

**$400,000**  Transferred August 24, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to M&T Bank Account #0165 in the name of PARLATO DEVELOPMENT.

**$150,000**  Transferred September 1, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to Bank of America Account #0165 in the name of PARLATO DEVELOPMENT.

**$50,000** Transferred September 2, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to Citizen's Bank Account #6877 in the name of PARLATO DEVELOPMENT.

**$60,000** Transferred September 18, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to M&T Bank Account #0165 in the name of PARLATO DEVELOPMENT.

**$50,000** Transferred November 2, 2009, from M&T Bank Account #0702 in the name of WHITESTAR DEVELOPMENT to an account in the name of SELECT DEVELOPMENT.

**$910,000**          **Total 2009**

44.    The final 4 (four) transactions took place in 2010 approximate to the time frame of   PARLATO's sale of his interest in THE PROPERTY.   These   2010 transactions resulted in the diversion of revenues which totaled $565,223.   Additional information concerning these transfers will be more fully outlined in paragraph 46 of this affidavit.

## LIQUIDATION OF PARLATO's INTEREST IN THE PROPERTY

45.    In July 2010, PG bought PARLATO's interest in WHITESTAR DEVELOPMENT, including his management rights and ownership in the PROPERTY, for a total of $1,000,000 which was to be paid over ten years. PG, with financial assistance from LR, decided to pay-off PARLATO early.  In September 2011, LR paid PARLATO $575,000 in order to satisfy the remaining outstanding balance.

## REVENUE DIVERTED NEAR THE TIME OF PARLATO's SALE OF HIS MANAGEMENT RIGHTS IN THE PROPERTY

46.    As noted above, the final four (4) transactions took place in the same time frame as PARLATO's sale of his interest in THE PROPERTY.  All of these four (4) transactions involve bank accounts in the name of ONE NIAGARA CENTER.  ONE NIAGARA CENTER, like many other entities, was used to divert revenues away from the operations of TOURIST SERVICES.  Once again, these four transfers were hidden from LR, DH, and PG, the new owner who began operating THE PROPERTY as of July 26, 2010.

47.    ONE NIAGARA CENTER, INC. was established by PARLATO on May 6, 2010.  Two bank accounts were then opened for this corporation, one at M&T Bank and one at HSBC Bank.  The four transactions are specifically identified as follows:

**$400,000**   Transferred July 19, 2010, from HSBC Bank Account #6737 in the name of ONE NIAGARA CENTER to M&T Bank Account #2299 in the name of ONE NIAGARA CENTER.  The transfer of these funds resulted in an electronic transmission to go over state lines between the Western District of New York (WDNY) and the city of New Castle in the state of Delaware in violation of of 18 U.S.C. § 1343 (wire fraud).

**$57,223**   On July 20, 2010, PARLATO deposited two checks from Cataract Tours & Sightseeing into M&T Bank Account #2299 in the name of ONE NIAGARA CENTER. **The $57,223 transfer along with the $400,000 transfer on July 19, 2010 subsequently funded a $425,000 transfer from the M&T Bank Account #2299 in the name of NIAGARA CENTER into the Bank of America Account #0165 in the name of PARLATO DEVELOPMENT.**

**$28,000**   On July 23, 2010, PARLATO directed deposited $28,000 cash into M&T Bank Account #2299 in the name of ONE NIAGARA CENTER

**$80,000**   Transferred July 28, 2010, from HSBC Bank Account #6737 in the name of ONE NIAGARA CENTER to Bank of America #2881 ~~not 4444~~ in the name of NIAGARA FRONTIER DEVELOPMENT.

**$565,223      Total 2010**

48.     SELVARAJ opened M&T Bank account #2299 in the name of ONE NIAGARA CENTER, INC. with a $100 deposit on July 13, 2010, slightly over a week before PARLATO signed the agreement to sell his interest in the ONE NIAGARA building.  SELVARAJ and PARLATO are both listed as signers on the account.

49.     ONE NIAGARA CENTER, INC., HSBC Bank checking account number #6737 was opened on June 18, 2010 and was active throughout the 2010 summer tourist season before going dormant in September, 2010.  Investigation determined that Parlato controlled this account.  Analysis of the banking activity revealed the funds deposited to this ONE NIAGARA CENTER account #6737 were primarily electronic ATM deposits, funded by an ATM machine located at THE PROPERTY.  The cash that stocked this ATM machine consisted of parking lot revenues.  The deposits into this account were consistent with prior ATM deposit activity.

50.    The use of these ONE NIAGARA CENTER accounts had no business purpose that benefited TOURIST SERVICES.    Additionally, LR was not aware of the existence of these accounts and PG was not aware of them at the time he purchased WHITESTAR from PARLATO.   These transactions reflect PARLATO's efforts to divert funds away from their rightful owners and conceal those funds.

51.    Both PARLATO and SELVARAJ have made statements explaining that the cash from parking revenues was deposited into the ATM machines located on the property. Specifically, on January 4, 2012, PARLATO was telephonically interviewed by Special Agents from the FBI.  One week later, on January 12, 2012, PARLATO authored an article in his newspaper, The Niagara Falls Reporter, with the heading, "Being Under Investigation Might be a Good Thing," in which he wrote:

> "Among the many lies the liars have said is that, because I ran a cash business for a while, I must have pocketed cash illegally. There are a lot of cash businesses in the world. Indeed, most retail businesses are. That does not make them illegal.
>
> Wait until they find out that I ordered most of the cash to go from employees' hands right to busy ATM machines, where it went right into bank accounts, where every dime is accounted. The rest went straight to the bank."

52.    In a July 16, 2009 civil deposition, SELVARAJ testified that the ATM machine belonged to TOURIST SERVICES or ONE NIAGARA LLC (there was no ONE NIAGARA CENTER at the time of this testimony), although in 2009 the ATM deposits were made to an account held by WHITESTAR.  All of the money in the ATM account is revenue because the cash that was used to stock the machine was parking lot revenue that had not previously been deposited or accounted for in the company books and records.  A

23

portion of her testimony is reflected below.

"Well, see there are two things to see for the ATM. One is the amount of cash that you put in, and the second is the surcharge.

Now, the amount of money that you put in is nothing but your revenue which you're depositing into the bank via a different route. Instead of me going in and depositing it's going through the network **so that will not be counted as revenue**. (emphasis added). It's the surcharge that will be counted as revenue.

So suppose I put in let's say two thousand into the ATM, and let's say there were a hundred transactions. Then – and if you make two dollars a transaction then your total amount deposited in the account would be twenty-two hundred, but you will count only two hundred as your revenue because two thousand has already been counted; you don't want to count it twice."

## PARLATO IOLA ACCOUNTS

53.     There are three (3) IOLA accounts that are significant to PARLATO's scheme to conceal funds and that are the subject of this seizure warrant affidavit. PARLATO and SELVARAJ directed deposits of the diverted funds into these accounts. The stolen funds included monies diverted from revenue generated by THE PROPERTY.

54.     Attorneys routinely receive funds to be held in trust for future use. If these funds are large in amount or to be held for a long period of time, the attorney customarily deposits the money in a certificate of deposit or other interest bearing account in the name of, and for the benefit of, the client. However, in the case of deposits which are small in amount or are short term in duration, it is impractical to establish separate interest bearing accounts for each client. The New York State IOLA program requires attorneys to open IOLA accounts for the deposit of these nominal or short term funds. These otherwise idle funds are then pooled to generate interest income which is forwarded directly from the financial institution to the IOLA Fund.

24

55.     Frank Parlato, Sr., who is 89 years old, was interviewed on March 11, 2014. He advised that he is an attorney and used to be involved in real estate. Frank Parlato, Sr. stated he used to represent his son, (PARLATO) as an attorney in real estate deals but he no longer does. Frank Parlato, Sr. stated his son, (PARLATO) is no longer involved in the operations at THE PROPERTY. Frank Parlato, Sr. acknowledged his ownership of an IOLA account and advised that his son (PARLATO) put money into his (Frank Parlato, Sr) IOLA account in order to shield it from "creditors" and "protect it from lawsuits".[1] Frank Parlato, Sr. advised that he and his son (PARLATO) both write checks from the account and both have signature authority on the accounts. No explanation was provided that explained why either SELVARAJ or his son had signatory authority on these IOLA accounts. These three (3) IOLA accounts will be described in detail later in this affidavit.

## FINANCIAL ANALYSIS OF THE TRANSFER OF DIVERTED FUNDS INTO THE IOLA ACCOUNTS INCLUDING SPECIFIC IDENTIFIABLE WIRE FRAUDS AND LAUNDERED FINANCIAL TRANSACTIONS

56.     From January 1, 2009 through July 31, 2010 PARLATO and SELVARAJ engaged in a series of financial transactions that resulted in the diversion of approximately $1,475,223 from the business operations of TOURIST SERVICES. In an effort to conceal this financial activity, PARLATO and SELVARAJ established a multitude of entities and bank accounts, which were used to transfer funds in a complex and convoluted series of financial transactions that lacked any legitimate business purpose, and appeared to have

---

[1] ████████████████████████████████████████

been conducted solely to disguise the location, the source, the owernship and the control of these funds.

57.    Probable cause exists to believe that violations of the wire fraud statute occurred during some of these transfers.   In addition, violations of money laundering statutes occurred involving the transfer of these funds which were clearly conducted to conceal and disguise the location, the source, the ownership, and the control of these funds. Put another way, these transfers were conducted, in part, in an effort to deceive PARLATO's partners as to the viability of business operations.   Additionally, these transactions were structured to evade potential civil judgments, creditors and tax authorities. Ultimately, the majority of the monies were moved to one of three (3) IOLA accounts described below.

58.    The three (3) IOLA accounts, with approximate balances, as of July 6, 2015 are identified as follows:

**BANK OF AMERICA** ACCOUNT #483040498448 held in the name of NEW YORK IOLA TRUST ACCOUNTS, FRANK R PARLATO TRUSTEE          **$132,000.00**

**FIRST NIAGARA BANK** ACCOUNT #7900244836 held in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK          **$460,986.32**

**KEY BANK** ACCOUNT #327831000606 held in the name of FRANK R PARLATO IOLA FUND ATTORNEY ESCROW ACCOUNT/ IOLA          **$407,309.04**

TOTAL AS OF JULY 6, 2015          **$1,000,295.36**

59.    This analysis is divided into four (4) sections:

**SECTION ONE** – Highlights the initial movement of revenues generated by the operations of THE PROPERTY into PARLATO controlled accounts not affiliated with the operations of THE PROPERTY.

**SECTION TWO** – Highlights the transfers both into and away from M&T Bank Account #0165 in the name of PARLATO DEVELOPMENT.

**SECTION THREE** - Highlights the entities and banking activity that eventually resulted in transfers of funds to the First Niagara Bank, account ending in #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.   The other two IOLA accounts were initially funded with transfers from this IOLA account at First Niagara Bank.

**SECTION FOUR** - Highlights the activity in the three (3) IOLA accounts.

## SECTION ONE

60.    The vast majority of the funds that represent the revenues from THE PROPERTY were diverted from bank accounts held by either M&T Bank account #0702 in the name of WHITESTAR DEVELOPMENT; HSBC Bank account #6737 in the name of ONE NIAGARA CENTER or M&T Bank account #2299 in the name of ONE NIAGARA CENTER.   These accounts had been used to receive the revenues from the business operations of Tourist Services.

**2009 Transfers Away From M&T Acct. #0702 in the name of   WHITESTAR DEVELOPMENT**

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Aug. 6 | #7024 | Citizens Bank | DAYTON INGERSOLL | $200,000 |
| Aug. 24 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $400,000 |
| Sept. 1 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $150,000 |
| Sept. 2 | #6877 | Citizens Bank | PARLATO DEVELOPMENT | $50,000 |

| | | | | |
|---|---|---|---|---|
| Sept. 18 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $60,000 |
| Nov. 2 | Not Identified | | SELECT DEVELOPMENT | $50,000 |

**2009 TOTAL**                                                                      **$910,000**

**2010 Transfers away from M&T Bank Acct. #2299 in the name of ONE NIAGARA CENTER**

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|---|---|---|---|---|
| Jul. 22 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $425,000 |
| Jul. 27 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $47,000 |

**2010 Transfers away from HSBC Bank Acct. #6737 in the name of ONE NIAGARA CENTER**

| | | | | |
|---|---|---|---|---|
| Jul. 28 | #2881 | Bank of America | NIAGARA FRONTIER DEVELOPMENT CORP. | $80,000 |

**2010 TOTAL**                                                                      **$552,000**

61.     These amounts ($910,000+$552,000) total $1,462,000 of funds diverted from the business operations of the property at One Niagara.  The small difference between the amount described in paragraph 42, $1,475,223 and $1,462,000 is caused by the funds that were moved between the two (2) ONE NIAGARA CENTER accounts.

**SECTION TWO**

62.     This analysis will discuss the transfers both into and away from M&T Bank account #0165 in the name of PARLATO DEVELOPMENT. Some of the funds were dissipated over time as will be described later and some of these funds traced will be those amounts that eventually resulted in transfers into the IOLA accounts.

63.     As noted above, five (5) of the initial nine (9) transfers were made to M&T Bank account #0165 in the name of PARLATO DEVELOPMENT.   This entity is a corporation established and controlled by PARLATO.   PARLATO had initial signature authority over this account with SELVARAJ being added to the account on September 23, 2009.   Additional accounts were also opened for this entity including two accounts, #6966 and 6877, established at Citizens Bank on August 3, 2009.   Both PARLATO and SELVARAJ had signature authority over these accounts.   The entity has never filed a corporate federal income tax return.   Account activity in M&T Bank account #0165 in the name of PARLATO DEVELOPMENT was almost non-existent from March 21, 2008 through August 1, 2009.   On August 1, 2009, the account held a balance of $2,500.

Based on review of bank account activity, the primary purpose of these accounts, after August 1, 2009, involved the transfer of funds between other PARLATO controlled companies and accounts.

64.     On August 7, 2009, a deposit of $395,000 was made to the PARLATO DEVELOPMENT account #0165.   These funds appear to be unrelated to revenues generated from THE PROPERTY.   Analysis revealed these funds were later transferred to, and comingled with, diverted revenues in the DAYTON INGERSOLL Citizens Bank account #7024.

65.     From the above list of diverted funds, the following is a summary of the transfers into the M&T Bank account #0165 in the name of PARLATO DEVELOPMENT:

**2009 Transfers away from M&T Acct. #0702 in the name of WHITESTAR DEVELOPMENT and into M&T Acct. #0165 in the name of PARLATO**

29

DEVELOPMENT

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Aug. 24 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $400,000 |
| Sept. 1 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $150,000 |
| Sept. 18 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $ 60,000 |
| **TOTAL** | | | | **$610,000** |

**2010 Transfers away from M&T Bank Acct. #2299 in the name of ONE NIAGARA CENTER and into M&T Acct. #0165 in the name of PARLATO DEVELOPMENT** (note some of the monies funding these transfers originally came from the HSBC Bank account #6737 in the name of ONE NIAGARA CENTER)

| | | | | |
|------|---------|------|--------------|--------|
| Jul. 22 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $425,000 |
| Jul. 27 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $ 47,000 |
| | | | | **$472,000** |

**2009 & 2010 TOTAL INTO M&T ACCT. #0165, PARLATO DEVELOP. $1,082,000**

66.     In part, these aforementioned deposits into the M&T Bank account #0165 in the name of PARLATO DEVELOPMENT, funded transfers to another group of accounts controlled by PARLATO and SELVARAJ. They are identified as follows:

**2009 Transfers away from M&T Bank Acct. #0165 in the name of PARLATO DEVELOPMENT and into another group of accounts maintained by PARLATO & SELVARAJ**

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Aug. 10 | #7024 | Citizens Bank | DAYTON INGERSOLL | $350,000 |
| Aug. 10 | #7024 | Citizens Bank | DAYTON INGERSOLL | $50,000 |
| Sept. 23 | #6834 | Citizens Bank | SELVARAJ LLC | $250,000 |

| Sept. 23 | #4402 | Bank of America | SELVARAJ LLC | $100,000 |
| Oct. 21 | #2836 | Bank of America | ROBERT FRANCIS DEVELOPMENT CORP. | $250,000 |
| Oct. 21 | #2894 | Bank of America | ANDREW THOMAS, Inc. | $150,000 |

**2010 Transfers away from M&T Bank Acct. #0165 in the name of PARLATO DEVELOPMENT and into another group of accounts maintained by PARLATO & SELVARAJ**

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| July 22 | #6575 | Citizens Bank | ROBERT FRANCIS DEVELOPMENT CORP. | $425,000 |

**TOTAL 2009 & 2010**              **$1,575,000**

## SECTION THREE

67.   The following paragraphs will discuss the movement of money from multiple accounts and entities controlled by PARLATO.  Ultimately, most of the monies highlighted in this section's accounts were deposited into First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.

68.   This section will trace the transfers from M&T Bank account #0165 in the name of PARLATO DEVELOPMENT that had been identified in the prior section. Additionally, it will trace two transfers identified in the first section that did not pass through the M&T Bank account #0165 in the name of PARLATO DEVELOPMENT. Those transfers, as reflected in the Section One, were as follows:

31

2009 Transfers away from M&T Bank Acct. #0702 in the WHITESTAR DEVELOPMENT not into M&T Acct. #0165 in the name of PARLATO DEVELOPMENT

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Aug. 6 | #7024 | Citizens Bank | DAYTON INGERSOLL | $200,000 |
| Sept. 2 | #6877 | Citizens Bank | PARLATO DEVELOPMENT | $ 50,000 |

69.   DAYTON INGERSOLL & ASSOCIATES INC. (DAYTON INGERSOLL) was incorporated in March 2008.   Between April and July 2009, PARLATO and SELVARAJ established three bank accounts for this entity. They both had signature authority over these accounts.   The two accounts to be discussed were opened at Citizens Bank accounts #6931 and #7024 both in the name of DAYTON INGERSOLL & ASSOCIATES.   DAYTON INGERSOLL appears to be a sham corporation in that substantially all the activity involved the transfer of funds between other PARLATO controlled companies and accounts.   The entity has never filed a corporate federal income tax return.

70.   As reflected in Section Two, two (2) transfers totaling $400,000 ($350,000+50,000) were made from M&T Bank account #0165 in the name of PARLATO DEVELOPMENT to the Citizens Bank account #7024 in the name of DAYTON INGERSOLL.   Additionally as outlined on  August 6, 2009 $200,000 had been directly transferred from M&T Bank account #0702 in the name of WHITESTAR DEVELOPMENT into this Citizens Bank account #7024 in the name of DAYTON INGERSOLL.   The deposit activity into this Citizens Bank account #7024 in the name of

DAYTON INGERSOLL is summarized as follows:

**2009 Transfers into Citizens Bank Acct. #7024 in the name of DAYTON INGERSOLL**

| DATE | ACCOUNT | BANK | SOURCE ACCOUNT | AMOUNT |
|------|---------|------|----------------|--------|
| Aug. 6 | #0702 | M&T Bank | WHITESTAR DEVELOPMENT | $200,000 |
| Aug. 7 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $350,000 |
| Aug. 7 | #0165 | M&T Bank | PARLATO DEVELOPMENT | $50,000 |
| | | | TOTAL | $600,000 |

71.     Additionally, on August 7, 2009, $200,000 was transferred from this Citizens Bank account #7024 in the name DAYTON INGERSOLL and is summarized as follows:

**2009 Transfers from Citizens Bank Acct. #7024 in the name of DAYTON INGERSOLL**

| DATE | ACCOUNT | BANK | RECEIVING ACCT. NAME | AMOUNT |
|------|---------|------|----------------------|--------|
| Aug. 7 | #6931 | Citizens Bank | DAYTON INGERSOLL | $100,000 |
| Aug. 7 | #6923 | Citizens Bank | WHITESTAR DEVELOPMENT | $100,000 |

72.     The $100,000 initially transferred to the Citizens Bank account #6923 in the name of WHITESTAR DEVELOPMENT was returned to the Citizens Bank account #7024 in the name of Dayton Ingersoll ten days later, on August 17, 2009.

73.     On August 20, 2009, $325,000 was transferred from the Citizens Bank account #7024 in the name of Dayton Ingersoll.  $300,000 of this amount was transferred to a different Citizens Bank account #6966 in the name of PARLATO DEVELOPMENT. The $300,000 transfer will be discussed in the following paragraphs.

33

74.    As a consequence of this identified movement of money, approximately $274,000 remained in the Citizens Bank accounts #6931 and #7024 both in the name of DAYTON INGERSOLL.  The approximate account balances are reflected as follows:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|---|---|---|---|---|
| Nov. 1 | #7024 | Citizens Bank | DAYTON INGERSOLL | $174,000 |
| Nov. 1 | #6931 | Citizens Bank | DAYTON INGERSOLL | $100,000 |
| TOTAL | | | | $274,000 |

75.    As reflected previously, the August 20, 2009  $300,000 transfer went from the Citizens Bank account #7024 in the name of Dayton Ingersoll into Citizens Bank account #6966 in the name of PARLATO DEVELOPMENT.  These funds were subsequently transferred as follows:

**2009 Transfers from Citizens Bank Acct. #6966 in the name of PARLATO DEVELOPMENT**

| DATE | ACCOUNT | BANK | RECEIVING ACCT. NAME | AMOUNT |
|---|---|---|---|---|
| Sept. 25 | #6524 | Citizens | NIAGARA FRONTIER LENDING CORP. | $99,900 |
| Sept. 25 | #6567 | Citizens | NIAGARA FRONTIER DEVELOPMENT CORP. | $93,900 |
| Sept. 25 | #6540 | Citizens | ANDREW THOMAS Inc. | $93,900 |
| Sept. 25 | #6591 | Citizens | ROBERT FRANCIS DEVELOPMENT CORP. | $11,000 |

The respective balances in three (3) of these accounts on Nov. 1, 2009 were as follows:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|---|---|---|---|---|
| Nov. 1 | #6524 | Citizens | NIAGARA FRONTIER LENDING CORP. | $71,926 |
| Nov. 1 | #6567 | Citizens | N IAGARA FRONTIER | $93,974 |

DEVELOPMENT CORP.

Nov. 1     #6540     Citizens          ANDREW THOMAS Inc. $93,947

76.    Subsequent to the September 25, 2009 transfer to #6524, the balance was drawn down to $71,926. The other two accounts increased as a consequence of interest income being added to the balances.

## SELVARAJ LLC AND RELATED ACTIVITY

77.    SELVARAJ LLC was formed on September 2, 2009. Both PARLATO and SELVARAJ are reflected as manager/members of this LLC. Multiple bank accounts were opened for this entity in September 2009, with both PARLATO and SELVARAJ having signature authority over them.   A substantial amount of the banking activity conducted in these accounts consisted of transfers between PARLATO controlled companies and accounts. The entity has never filed a federal income tax return.

78.    Two of the SELVARAJ LLC accounts received transfers from M&T Bank account #0165 in the name of PARLATO DEVELOPMENT. As previously reflected these two transfers were identified as follows:

**2009 Transfers from M&T Bank Acct. #0165 in the name of   PARLATO DEVELOPMENT**

| DATE | ACCOUNT | BANK | RECEIVING ACCT. NAME | AMOUNT |
|------|---------|------|----------------------|--------|
| Sept. 23 | #6834 | Citizens Bank | SELVARAJ LLC. | $250,000 |
| Sept. 23 | #4402 | Bank of America | SELVARAJ LLC | $100,000 |

79.    On the same date, September 23, 2009, $225,000 was transferred from #6834 to Citizens Bank account #6826 in the name of SELVARAJ LLC.

80.    Prior to the above-referenced deposit into the account #4402 in the name of SELVARAJ LLC, a balance of approximately $50,000 existed.  This balance had been the result of a transfer from another SELVARAJ account not highlighted in this affidavit.

81.    Consequently,  the  November  1,  2009,  balances  in  these  accounts approximated the following:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Nov. 1 | #6826 | Citizens Bank | SELVARAJ LLC | $225,189 |
| Nov. 1 | #6834 | Citizens Bank | SELVARAJ LLC | $ 24,987 |
| Nov. 1 | #4402 | Bank of America | SELVARAJ LLC | $150,000 |

## ROBERT FRANCIS DEVELOPMENT INC. AND RELATED ACTIVITY

82.    This entity was incorporated on September 23, 2009.  Multiple accounts were established for this entity in late September 2009.  Both PARLATO AND SELVARAJ had signature authority over these accounts.  One of the accounts was identified as Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC..  Like DAYTON INGERSOLL, ROBERT FRANCIS DEVELOPMENT INC., appears to be a sham in that its primary activity involved the transfer of funds between other PARLATO controlled companies and accounts.  The entity has never filed a corporate federal income tax return.  Two transfers were made into account #6591 on September 25, 2009 and the

36

source of those funds is as follows:

**2009 Transfer into Citizens Bank Acct. #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC.**

| DATE | ACCOUNT | BANK | SOURCE ACCOUNT NAME | AMOUNT |
|------|---------|------|---------------------|--------|
| Sept. 25 | #6966 | Citizens | PARLATO DEVELOPMENT | $11,000 |
| Sept. 25 | #6877 | Citizens | PARLATO DEVELOPMENT | $83,000 |

The $11,000 transfer was from the Citizens Bank account #6966 in the name of PARLATO DEVELOPMENT was outlined previously in the activity of the DAYTON INGERSOLL accounts.

83.     The source of the $83,000 in the PARLATO DEVELOPMENT Citizens Bank account #6877 included $50,000 transferred on September 2, 2009. This $50,000 was identified in Section One as originating from the WHITESTAR Citizens Bank account #0702. The origin of the additional balance was not traced.

84.     Subsequent to these two (2) deposits, limited activity took place in this account. Consequently, the approximate balance in this Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC. was as follows:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| **2009**<br>Nov. 1 | #6591 | Citizens Bank | ROBERT FRANCIS DEVELOPMENT Inc. | $93,918 |

## NOVEMBER 18, 2009 ACTIVITY

85.     As previously noted, the following accounts had the listed approximate

balances as of November 1, 2009:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|------|---------|------|--------------|--------|
| Nov. 1 | #6591 | Citizens Bank | ROBERT FRANCIS DEVELOPMENT Inc. | $93,918 |
| Nov. 1 | #4402 | Bank of America | SELVARAJ LLC | $150,000 |
| Nov. 1 | #6826 | Citizens Bank | SELVARAJ LLC | $225,189 |
| Nov. 1 | #6834 | Citizens Bank | SELVARAJ LLC | $ 24,987 |
| Nov. 1 | #6524 | Citizens Bank | NIAGARA FRONTIER LENDING CORP. | $ 71,926 |
| Nov. 1 | #6567 | Citizens Bank | NIAGARA FRONTIER DEVELOPMENT CORP. | $ 93,974 |
| Nov. 1 | #6540 | Citizens Bank | ANDREW THOMAS Inc. | $ 93,947 |
| Nov. 1 | #7024 | Citizens Bank | DAYTON INGERSOLL | $174,000 |
| Nov. 1 | #6931 | Citizens Bank | DAYTON INGERSOLL | $100,000 |
| **TOTAL** | | | | **$1,027,941** |

86.     On November 18, 2009, PARLATO and SELVARAJ caused a series of

transactions to be initiated through the Citizens Bank account #6591 in the name of

ROBERT FRANCIS DEVELOPMENT INC.  As described in the following paragraph,

transfers from most of the above referenced accounts into this account on November 18,

2009, totaled $660,179.  On this same date, $630,658 was transferred away from this same

ROBERT FRANCIS DEVELOPMENT account.

38

87.    The significant November 18, 2009 transfers to and from this account are reflected as follows:

**November 18, 2009 Transfers into Citizens Bank Acct. #6591 in the name of ROBERT FRANCIS DEVELOPMENT Inc.**

| SOURCE ACCOUNT | BANK | ACCOUNT | AMOUNT |
|---|---|---|---|
| DAYTON INGERSOLL | Citizens Bank | 7024 | $174,927 |
| DAYTON INGERSOLL | Citizens Bank | 6931 | $100,229 |
| SELVARAJ LLC | Citizens Bank | 6826 | $100,189 |
| NIAGARA FRONTIER DEVELOPMENT | Citizens Bank | 6567 | $ 93,974 |
| ANDREW THOMAS Inc. | Citizens Bank | 6540 | $ 93,947 |
| NIAGARA FRONTIER LENDING CORP. | Citizens Bank | 6524 | $ 71,926 |
| SELVARAJ LLC | Citizens Bank | 6834 | $ 24,987 |

**November 18, 2009 Transfers from Citizens Bank Acct. #6591 in the name of ROBERT FRANCIS DEVELOPMENT Inc.**

| RECEIVING ACCOUNT | BANK | ACCOUNT | AMOUNT |
|---|---|---|---|
| DAYTON INGERSOLL | Citizens Bank | 6931 | $130,658 |
| NIAGARA FRONTIER DEVELOPMENT | Citizens Bank | 6567 | $125,000 |
| ANDREW THOMAS Inc. | Citizens Bank | 6540 | $125,000 |
| NIAGARA FRONTIER LENDING CORP. | Citizens Bank | 6524 | $125,000 |
| PARLATO DEVELOPMENT | Citizens Bank | 6966 | $125,000 |

These transfers appeared to have no logical purpose other than to disguise the nature, source and origin of the funds.

88.    Once these transfers were made, the account balances on or about the close of business, November 18, 2009, approximated the following:

**Account Balances on close of business November 18, 2009**

| ACCOUNT NAME | BANK | ACCOUNT | AMOUNT |
|---|---|---|---|
| ROBERT FRANCIS DEVELOPMENT Inc. | Citizens Bank | 6591 | $125,000 |
| SELVARAJ LLC | Citizens Bank | 6826 | $125,000 |
| SELVARAJ LLC | Bank of America | 4402 | $209,000 |
| SELVARAJ LLC | Citizens Bank | 6834 | $ 0.00 |
| NIAGARA FRONTIER LENDING CORP. | Citizens Bank | 6524 | $125,000 |
| NIAGARA FRONTIER DEVELOPMENT | Citizens Bank | 6567 | $125,000 |
| ANDREW THOMAS Inc. | Citizens Bank | 6540 | $125,000 |
| DAYTON INGERSOLL | Citizens Bank | 6931 | $130,000 |
| DAYTON INGERSOLL | Citizens Bank | 7024 | $ 0.00 |
| PARLATO DEVELOPMENT | Citizens Bank | 6966 | $125,000 |
| **TOTAL** | | | **$1,089,000** |

89.    The balance in the SELVARAJ LLC account #4402 at Citizens Bank was not involved in the activity that moved through the ROBERT FRANCIS DEVELOPMENT account #6591 at Citizens Bank. However, the balance increased to approximately $209,000 with a November 18, 2009 transfer to this account from the SELVARAJ LLC account #2616.

40

## ANALYSIS OF HIGHLIGHTED ACCOUNTS AFTER NOVEMBER 18, 2009

90.     The following analysis will track the activity subsequent to the November 18, 2009 transfers.  Ultimately, a significant portion of these funds were transferred into the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND of THE STATE OF NEW YORK  in September of 2010.  This is one of the three (3) IOLA accounts that is subject to seizure and forfeiture.

91.     The largest transfer to this IOLA account resulted from the comingling of many account balances into Citizens Bank account #6508 in the name of ANDREW THOMAS Inc.

**Citizens Bank Acct. #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC.**

92.     As reflected above, the approximate balance in this account after the November 18, 2009 activity was $125,000.  Other than the accumulation of interest, there was no activity in this account until July 22, 2010.

93.     As outlined in Section One, $425,000, which originated on July 22, 2010 from M&T Bank account #2299 in the name of ONE NIAGARA CENTER, was transferred into M&T Bank account #0165 in the name of PARLATO DEVELOPMENT.

94.     Subsequently, on July 22, 2010, the $425,000, as outlined in Section Two, was transferred from M&T Bank account #0165 in the name of PARLATO DEVELOPMENT into Citizens Bank account #6575 in the name of  ROBERT FRANCIS

41

DEVELOPMENT INC.

95.    On that same date, July 22, 2010, a transfer from the Citizens Bank account #6575 in the name of ROBERT FRANCIS DEVELOPMENT INC. in the amount of $425,000 was made into another Citizens Bank account #6591 also in the name of ROBERT FRANCIS DEVELOPMENT INC.

96.    This $425,000 then supported two (2) wire transfers of $250,000 and $155,000 into the First Niagara Bank account # 4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK

97.    On September 9, 2010, a wire transfer of $250,000 from Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC. was made into First Niagara Bank account # 4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK. The transfer of these funds resulted in an interstate electronic transmission between the Western District of New York (WDNY) and the city of East Providence in the state of Rhode Island in violation of 18 U.S.C. §1343 (wire fraud) and in violation of federal money laundering statutes.

98.    On September 14, 2010, a wire transfer of $155,000 from Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC. was made into First Niagara Bank Account # 4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK. The transfer of these funds resulted in an interstate

electronic transmission between the Western District of New York (WDNY) and the city of East Providence in the state of Rhode Island in violation of 18 U.S.C. §1343 (wire fraud) and in violation of federal money laundering statutes.

99.     The resulting balance, on September 15, 2010, in this Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC. totaled $145,593. Between September 20 and September 23, four deposit items were added to this account. Collectively these deposits totaled $23,055. These deposit items were not reviewed.

100.    On September 27, 2010,  the remaining balance of $168,650 in this Citizens Bank account #6591 in the name of ROBERT FRANCIS DEVELOPMENT INC. was transferred to the Citizens Bank account #6508 in the name of ANDREW THOMAS INC.

## Citizens Bank Account #6826 in the name of SELVARJ LLC

101.    Other than the accumulation of interest, there was no activity in the Citizens Bank account #6826 in the name of SELVARJ LLC from November 18, 2009 through September 26, 2010.  On September 27, 2010, the entire account balance of $125,529 was transferred to the Citizens Bank account #6508 in the name of ANDREW THOMAS INC.

## Citizens Bank Acct. #6524 in the name of NIAGARA FRONTIER LENDING CORP.

102.    NIAGARA FRONTIER LENDING CORPORATION was incorporated by PARLATO on September 23, 2009.  Multiple bank accounts were opened for this entity in

late September 2009.  Both PARLATO and SELVARAJ had signature authority for these accounts.  Like DAYTON INGERSOLL and ROBERT FRANCIS DEVELOPMENT INC., NIAGARA FRONTIER LENDING CORPORATION appears to be a sham corporation in that its primary activity involved the transfer of funds between other PARLATO controlled companies and accounts.  The entity has never filed a corporate federal income tax return.

103.  In addition to the accumulation of interest, this account had a limited amount of banking activity before the final transfer of funds to the Citizens Bank account #6508 in the name of ANDREW THOMAS INC.  This limited activity is identified as follows:

Four (4) transactions involving an unknown account were noted.  The net change associated with these four transactions increased the account balance by $2,900.

Five (5) unknown deposits which totaled $90,397 and three (3) unknown withdrawals which totaled $78,993 were identified.  This activity was not analyzed any further.

104.  On September 27, 2010, the entire account balance of Citizens Bank account #6524 in the name of NIAGARA FRONTIER LENDING COPORATION totaling $139,826 was transferred to the Citizens Bank account #6508 in the name of ANDREW THOMAS INC.

**Citizens Bank Acct. #6567 in the name of NIAGARA FRONTIER DEVELOP. CORP.**

105.  NIAGARA FRONTIER DEVELOPMENT CORPORATION was incorporated by PARLATO on September 23, 2009.  Multiple bank accounts were opened for this entity in late September 2009.  Both PARLATO and SELVARAJ had signature

authority over these accounts. Like the other entities identified in this affidavit, NIAGARA FRONTIER DEVELOPMENT CORPORATION appears to be a sham corporation in that its primary activity involved the transfer of funds between other PARLATO controlled companies and accounts. The entity has never filed a corporate federal income tax return.

106.    Other than the accumulation of interest, there was no activity in this account from November 18, 2009 through September 26, 2010.  On September 27, 2010, the entire account balance of $125,486 was transferred to the Citizens Bank account #6508 in the name of ANDREW THOMAS INC.

### Citizens Bank Account #6540 in the name of ANDREW THOMAS INC.

107.    ANDREW THOMAS INC., was incorporated by PARLATO on September 23, 2009.  Multiple bank accounts were opened for this entity in late September 2009.  Both PARLATO and SELVARAJ had signature authority over these accounts.  Like other entities identified in this affidavit, ANDREW THOMAS INC., appears to be a sham corporation in that its primary activity involved the transfer of funds between other PARLATO controlled companies and accounts. The entity has never filed a corporate federal income tax return.

108.    Other than the accumulation of interest, there was no activity in this account from November 18, 2009 through September 26, 2010.  On September 27, 2010, $125,446 was transferred to the ANDREW THOMAS INC. account #6508.

45

**Citizens Bank Account #6508 in the name of ANDREW THOMAS INC.**

109.    As reflected above, this account received five (5) transfers resulting in deposits which totaled $684,937.   The balance in this account, prior to the September 27, 2010 activity was $100.   The deposits, all of which took place on September 27, 2010, are summarized as follows:

| SOURCE | AMOUNT |
|---|---|
| Citizens Bank Acct. #6591 ROBERT FRANCIS DEVELOPMENT INC. | $168,650 |
| Citizens Bank Acct. #6826 SELVARAJ LLC | $125,529 |
| Citizens Bank Acct. #6524 NIAGARA FRONTIER LENDING CORP. | $139,826 |
| Citizens Bank Acct. #6567 NIAGARA FRONTIER DEVELOPMENT CORP. | $125,486 |
| Citizens Bank Acct. #6540 ANDREW THOMAS INC. | $125,446 |
| **TOTAL** | **$684,937** |

Four (4) other nominal deposit items, which totaled less than $1,000, were also noted in the account activity.

110.    On September 28, 2010, $685,426 was wire transferred from this account to the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.  The transfer of these funds resulted in an interstate electronic transmission between the Western District of New York (WDNY) and the city of East Providence in the state of Rhode Island in violation of 18 U.S.C. §1343 (wire fraud) and in violation of federal money laundering statutes.

### Bank of America Account #4402 in the name of SELVARAJ LLC

111.    As reflected earlier, the approximate balance in this account after the November 18, 2009 activity was $209,000.  This account had received $100,000 of diverted revenues from the Parlato Development account #0165 on September 23, 2009.  Between November 18, 2009 and September 29, 2010 this account was drawn down to an approximate balance of $116,900.  The account balance never fell below $100,000.  On September 29, 2010, $115,000 was wire transferred from this account to the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.

### Citizens Bank Account #6931 in the name of DAYTON INGERSOLL

112.    As reflected earlier, the approximate balance in this account after the November 18, 2009 activity was $130,000.  In addition to the accumulation of interest, one withdrawal of $15,000 was noted.

113.    On September 13, 2010, $100,000 was wire transferred from this account to the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.  The transfer of these funds resulted in an interstate electronic transmission between the Western District of New York (WDNY) and the city of East Providence in the state of Rhode Island in violation of 18 U.S.C. §1343 (wire fraud) and in violation of federal money laundering statutes.

**Citizens Bank Account #6966 in the name of PARLATO DEVELOPMENT INC.**

114.   As reflected above, the approximate balance in this account after the November 18, 2009 activity was $125,000.  Other than the accumulation of interest, there was no other activity in this account.

115.   On September 21, 2010, $125,000 was wire transferred from this account into the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.   The transfer of these funds resulted in an interstate electronic transmission between the Western District of New York (WDNY) and the city of East Providence in the state of Rhode Island in violation of 18 U.S.C. §1343 (wire fraud) and in violation of federal money laundering statutes.

## ROBERT FRANCIS DEVELOPMENT INC. AND RELATED ACTIVITY

116.   ROBERT FRANCIS DEVELOPMENT, an entity that has been previously discussed, had two (2) accounts at Bank of America, that were opend on September 25, 2009, a checking account ending in #2836 in the name of ROBERT FRANCIS DEVELOPMENT INC., and a savings account ending in #4253 in the name of ROBERT FRANCIS DEVELOPMENT INC..  Both PARLATO and SELVARAJ had signature authority over these accounts.  As reflected in the earlier section highlighting the activity in the M&T Bank account #0165 in the name of PARLATO DEVELOPMENT, the following transfer was noted in 2009:

| DATE ACCOUNT | BANK | ACCT. NAME | AMOUNT |
|---|---|---|---|
| Oct. 21 #2836 2009 | Bank of America | Robert Francis Development Inc. | $250,000 |

117.    These funds were initially placed in the ROBERT FRANCIS checking account #2836.  On Nov. 18, 2009, $235,000 was transferred from this account to the ·ROBERT FRANCIS DEVELOPMENT INC. savings account #4253.   This savings account had little activity until September 23, 2010.

118.    Prior to any activity on September 23, 2010, the account balance in this ROBERT FRANCIS DEVELOPMENT INC. savings account #4253, was $235,479.  On September 23, 2010, two significant deposits were noted as being added to this account. These items were identified as follows:

| DATE | ACCOUNT | BANK | ACCOUNT NAME | AMOUNT |
|---|---|---|---|---|
| Sept. 23 | #4431 | Bank of America | Andrew Thomas, Inc. | $158,627 |
| Sept. 23 | #4444 | Bank of America | Niagara Frontier Development Corp. | $ 80,068 |

119.    On the same date, September 23, 2010, $235,000 was transferred from this Bank of America savings account #4253 in the name of ROBERT FRANCIS DEVELOPMENT INC. to the First Niagara Bank, account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.  In violation of federal money laundering statutes.

49

## SECTION FOUR

## IOLA Activity

**A.**  **First Niagara Bank Account ending in #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK**

120.  The primary account that ultimately received the diverted funds from the business operations of Tourist Services was an account at First Niagara Bank account ending in #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.  This account had originally been established by Frank Parlato, Sr., an attorney, in January 2009.

121.  Initially Parlato Sr. was the only individual with signature authority on this account.  SELVARAJ was added in March 2011 and PARLATO was added in September 2011.  Neither SELVARAJ nor PARLATO are attorneys.  Neither of them had any legitimate or lawful purpose for being added as signatories on Parlato Sr.'s IOLA account.

122.  As outlined previously, Parlato Sr. was interviewed regarding the deposit activity in this account and told investigators that his son (PARLATO) put money in the account to shield it from creditors and protect it from lawsuits (which, as noted, he later denied).

123.  Prior to the above referenced deposits, this account had a balance of approximately $1,525.  As reflected above, deposits in excess of $1,500,000 were made to this account.

50

124.    A summary of the significant deposits to this account is as follows:

| DATE 2010 | SOURCE ACCOUNT | BANK | ACCOUNT | AMOUNT |
|---|---|---|---|---|
| Sept. 9 | Robert Francis Development | Citizens Bank | #6591 | $250,000 |
| Sept. 13 | Dayton Ingersoll | Citizens Bank | #6931 | $100,000 |
| Sept. 14 | Robert Francis Development | Citizens Bank | #6591 | $155,000 |
| Sept. 21 | Parlato Development | Citizens Bank | #6966 | $125,000 |
| Sept. 23 | Robert Francis Development | Bank of America | #4253 | $235,000 |
| Sept. 28 | Andrew Thomas, Inc. | Citizens Bank | #6508 | $685,426 |
| Sept. 29 | Selvaraj LLC | Bank of America | #4402 | $115,000 |
| **TOTAL** | | | | **$1,665,426** |

125.    One other significant deposit was made to this account.  On September 28, 2011, PARLATO received a final payment from PG, financed by LR, for the sale of his interest in THE PROPERTY resulting in a deposit of $575,000.

126.    Even after the referenced deposits were made to this account, PARLATO's money movement continued.  For example, three of the initial disbursements from this IOLA account were identified as follows:

| DATE 2010 | RECEIVING ACCT. | BANK | ACCT. | AMOUNT |
|---|---|---|---|---|
| Sept. 20 | Gold Field Consulting | First Niagara Bank | #6484 | $250,000 |
| Sept. 20 | JF Anderson Consulting | First Niagara Bank | #6476 | $150,000 |

Sept. 23        JF Anderson Consulting        First Niagara Bank        #6476        $125,000

Both of these consulting entities[2] were owned and controlled by PARLATO.  Both entities were incorporated in September of 2010 and had accounts opened and controlled by PARLATO and or SELVARAJ in September 2010.

127.    Subsequent to the above referenced deposit, limited activity took place in the First Niagara Bank Account #6476 in the name of JF ANDERSON CONSULTING INC. On November 26, 2010, $200,000 was withdrawn from this account and returned to the First Niagara Bank account ending in #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.

128.    Funds which had been transferred to the First Niagara Bank Account #6484 in the name of GOLD FIELD CONSULTING, passed through multiple accounts before some of those monies were used to fund PARLATO's purchase of a home in Florida.

129.    Beginning in about March of 2011, PARLATO again began using this First Niagara Bank account ending in #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK.  A significant amount of money was directed to PARLATO's brother – Jim Parlato.  Jim Parlato also had a number of business entities. Many of these entities dealt with the purchase and sale of real estate.  One of these entities was identified as SELECT DEVELOPMENT CORPORATION.

---

[2] As before, it appears that these entities were established solely to open and maintain bank accounts and thus, appear to be sham corporations.

130.  SELECT DEVELOPMENT was first mentioned in the opening section of this analysis.  As reflected, on or about November 2, 2009 $50,000 was transferred from M&T Bank account #0702 in the name of WHITESTAR DEVELOPMENT to this entity.

131.  Based on review of disbursements from the First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK, over 15 pieces of real estate were purchased with funds from this account.  In many instances the purchasing entity was reflected as SELECT DEVELOPMENT or another entity controlled by Jim Parlato.  Based on a review of local county records, many of these properties have been sold.

132.  Another withdrawal of note was a $10,000 check payable to Pershing LLC, for the benefit of Robert M. Wilson.  Review of this item revealed Pershing LLC to be a clearing house for New England Securities, an investment brokerage firm.  New England Securities is currently maintaining an investment account in the name of Robert M Wilson Vending and ATM.  This account in the name of Robert M Wilson Vending and ATM Inc., was established by PARLATO and SELVARAJ on or about October 6, 2010. This account is owned and controlled by PARLATO and SELVARAJ.   It appears that this Robert M. Wilson Vending and ATM account was established solely to maintain this balance and is thus, another entity that is a sham entity.

133.  Two (2) other disbursements from this IOLA funded the initial deposits to the two (2) remaining IOLA accounts.

53

134.    This First Niagara Bank Account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK account was continually drawn down to a current approximate balance of $460,986 as of August 20, 2015.

**B.**    **Bank of America account #8448 in the name of NEW YORK IOLA TRUST ACCOUNTS, FRANK R PARLATO TRUSTEE**

135.    On October 11, 2011, $250,000 was transferred from First Niagara Bank Account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK into Bank of America Account #8448 in the name of NEW YORK IOLA TRUST ACCOUNTS, FRANK R PARLATO TRUSTEE.

136.    This account was opened in September 2011.  PARLATO, SELVARAJ, and Frank Parlato Sr. have signature authority over this account. Limited activity has taken place in this account.  One of the other deposits to this account was a check from a Select Development Corporation bank account for $34,000.   This account balance has also dwindled down to a current approximate balance of $132,000 as of August 3, 2015.

**C.**    **Key Bank account #0606 in the name of FRANK R PARLATO IOLA FUND ATTORNEY ESCROW ACCOUNT/ IOLA**

137.    On August 12, 2011, $250,000 was transferred from First Niagara Bank account #4836 in the name of FRANK PARLATO IOLA FUND OF THE STATE OF NEW YORK into KEY BANK account #0606 in the name of FRANK R PARLATO

54

IOLA FUND ATTORNEY ESCROW ACCOUNT/ IOLA.

138.   This account was opened on March 2, 2011 by Frank Parlato Sr. with SELVARAJ as a co-signer.  On September 6, 2011 PARLATO was added on as a signator on the account.  Limited activity has occurred in this account other than the $250,000 deposit on August 12, 2011.  However, three other significant deposits were identified as follows:

| DATE | SOURCE | PAYEE | AMOUNT | NOTATION |
|---|---|---|---|---|
| Sept. 2 2011 | Frank Parlato, Attorney Business Account #1275 First Niagara Bank | PARLATO | $92,754 | Woodmere Mtg. Payoff |
| May 11 2011 | Select Development Corp | Frank Parlato, attorney | $12,000 | Payoff Lovejoy |
| June 13 2012 | Select Development Corp | Frank Parlato, attorney | $51,000 | Pay off on Atwood |

139.   A review of the real estate records associated with the purchases from the IOLA #4836, was completed.  Those records revealed real estate in the Buffalo, New York area had been purchased on streets named Lovejoy and Atwood by Jim Parlato or one of his entities.

140.   Only small disbursements have been made from this account.  The current approximate balance in this account is $407,250.23 as of August 20, 2015.

## IOLA OVERVIEW

141.    Many of these transactions which originated in large part with the diverted monies from THE PROPERTY constitute financial transactions conducted with specified unlawful activity proceeds in excess of $10,000.  Thus, these transactions are a violation of 18 U.S.C. §§ 1956(h) and 1957, and therefore, the three (3) aforementioned IOLA accounts are subject to seizure and forfeiture.

## PENDING INVESTIGATION

142.    A federal criminal investigation remains pending againt PARLATO and SELVARAJ and it is anticipated that formal criminal charges may be brought within the next thirty (30) days.

## APPLICABLE LAW

143.    The statutory provisions pursuant to which the contents and monies contained within the three (3) subject bank accounts constitute property representing proceeds traceable to violations of 18 U.S.C. §§ 1956(h) and 1957, and which are proceeds of a specified unlawful activity, to wit: wire fraud and wire fraud conspiracy in violation of 18 U.S.C. § 371 and 1343 and are thus subject to seizure and forfeiture to the United States are as follows:

**Title 18, United States Code, § 981** provides in pertinent part:

(a)(1) The following property is subject to forfeiture to the United States:

(C) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section   . . ., or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

56

**Title 18, United States Code, Section 982** provides in pertitent part:

(a)(1)  The court, in imposing sentence on a peson convicted of an offense  in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

(b) (1) The forfeiture of property under this section including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of.... 21 U.S.C. 853.

**Title 18, United States Code, Section 1956** provides in pertinent part:

(c)  As used in this section ----

(7) the term "specified unlawful activity" means ----
      (A) any act or activity constituting an offense listed in section 1961(1) of this title....

**Title 18, United States Code, Section 1961** provides in pertinent part:

As used in this chapter ----
(1) "racketeering activity means.....
      (B) any act which is indictable under any of the following provisions of title 18, United States Code.....section 1343 (relating to wire fraud)....

**Title 21, United States Code, Section 853** provides in pertinent part:

(f) The government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided under a search warrant.  If the court determines that there is probable cause to believe that the propety to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (3) of this section may be be sufficient assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

## REQUEST FOR RELIEF

144.     Based on the foregoing facts and statutes, I submit that probable cause exists to believe that the contents and monies contained within the subject bank accounts are proceeds involved in money laundering transactions, in violation of Title 18, United States Code, Sections 1956(h) and 1957 and which are proceeds of a specified unlawful activity, to wit: wire fraud in violation of Title 18, United States Code, Section 1343, thereby subjecting the financial accounts to seizure and forfeiture pursuant to the provisions of and Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and (b) and Title 21, United States Code, Section 853(f).

145.     The government has on multiple occasions negotiated with several attorneys who have represented PARLATO and requested that PARLATO agree to allow one of his attorneys to hold these funds in their own IOLA accounts or in escrow by the United States Marshals Service until the resolution of this matter, but to date, the money remains under PARLATO's control.  Thus, a seizure warrant is necessary to insure that the funds are not dissipated.

146.     The Court has authority to issue criminal seizure warrants as well as civil seizure warrants under applicable federal law.  With respect to the issuance of criminal seizure warrants pursuant to Title 21, United States Code, Section 853(f), the Court has to be satisfied that the issuance of other protective or restraining orders would be insufficient to preserve the property in the event of forfeiture.  Since this application seeks seizure authority under civil and criminal forfeiture theories, it is important to note that in your Affiant's

experience and his knowledge gained from other law enforcement officers, that in today's age of banking and the ease of which money can be transferred either by wire or other electronic means, that restraining orders are always not sufficient to protect the funds in the account. Further, as previously indicated, the government has unsuccessfully attempted to gain PARLATO'S consent to have either one of his attorneys or the U.S. Marshals Service to hold these funds in escrow pending the disposition of this matter. Therefore, the only method to insure that funds are not dissipated from these accounts is with the Court providing physical custody over the contents and monies within the accounts to the government and thus, for the purposes of this court granting the seizure warrants, your Affiant request that the seizure warrants be granted.

147.   The Court has jurisdiction to enter such orders and issue such seizure warrants pursuant to Title 28, United States Code, Sections 1355(b)(1)(A) and (d).

148.   After seizure, the federal government will hold the monies in the United States Marshals asset forfeiture holding account which is an interest bearing account. The government will initiate forfeiture proceedings and will provide notice of the forfeiture process to all interested parties who may have an interest or claim of ownership to the contents monies contained within the subject bank accounts in accordance with federal law.

## DIRECTIONS TO THE FINANCIAL INSTITUTIONS

149.    It is requested that the seizure warrants issued by the Court to BANK OF AMERICA, FIRST NIAGARA BANK, KEY BANK, and direct that the institutions immediately and without delay, liquidate the account of all contents and monies and provide an official bank check made payable to the "United States Marshals Service" in such amount to your Affiant.

150.    It is also requested that until such checks are made available to your Affiant that the Court's order direct that BANK OF AMERICA, FIRST NIAGARA BANK, KEY BANK shall not transfer, convey or dispose of any monies within the specified accounts of the financial institution without further order of this Court, that the financial institutions shall not honor any demands by anyone or any entity to release any money, nor shall the financial institutions honor any checks or other negotiable instruments drawn on the named accounts and presented to the financial institution after service of the seizure warrants and order.

151.    It is further requested that the Court's order direct that BANK OF AMERICA, FIRST NIAGARA BANK, KEY BANK immediately and without delay upon service of the seizure warrants and order, terminate, cancel, prohibit, abolish and de-authorize any and all authority for any automatic teller machine cards, debit cards, electronic funds transfer cards, or any other cards which are associated with the named accounts.

152.    It is further requested that the Court's order direct that BANK OF AMERICA, FIRST NIAGARA BANK, KEY BANK accept any future deposits to the named accounts, including but not limited to wire transfers from other bank accounts, and credit the accounts accordingly.

153.    It is further requested that the Court's order direct BANK OF AMERICA, FIRST NIAGARA BANK, KEY BANK  to comply with each and every term of the Court's order, however, subject to the Court modifying its own order for good cause shown.

## REQUEST FOR SEALING

154.    Due to the ongoing nature of this investigation and to prevent further dissipation of proceeds and assets, it is requested that this Affidavit be sealed for a period of ninety (90) days.

WHEREFORE, it is respectfully requested that the Court issue seizure warrants for the monies and contents contained with the following three (3) bank accounts:

CONTENTS AND MONIES CONTAINED WITHIN
**BANK OF AMERICA** ACCOUNT NO. 483040498448
HELD IN THE NAME OF NEW YORK IOLA TRUST
ACCOUNTS, FRANK R PARLATO TRUSTEE,

CONTENTS AND MONIES CONTAINED WITHIN
**FIRST NIAGARA BANK** ACCOUNT NO. 7900244836
HELD IN THE NAME OF FRANK PARLATO IOLA
FUND OF THE STATE OF NEW YORK and

CONTENTS AND MONIES CONTAINED WITHIN
**KEY BANK** ACCOUNT NO. 327831000606
HELD IN THE NAME OF FRANK R PARLATO IOLA
FUND ATTORNEY ESCROW ACCOUNT/IOLA

as set forth herein.


BRIAN A. BURNS
Special Agent
Federal Bureau of Investigation



Sworn to before me this _27th_
day of August, 2015


HONORABLE H. KENNETH SCHROEDER, Jr.
United States Magistrate Judge



P. 9 + 10 TRANSFER

TOURIST SERVICES, LLC

OPERATING AGREEMENT

Dated: April 14, 2006

BUL1B01\65558903

R01144

# TABLE OF CONTENTS

| Articles | | Page |
|---|---|---|
| RECITALS | | 1 |
| I | DEFINITIONS | 1 |
| | 1.1 Definitions | 1 |
| II | ORGANIZATION | 3 |
| | 2.1 Name | 3 |
| | 2.2 Principal Place of Business | 3 |
| | 2.3 Limited Liability | 3 |
| | 2.4 Initial Capital Contributions | 4 |
| | 2.5 Additional Contributions | 4 |
| | 2.6 Price For Additional Interest | 4 |
| | 2.7 New Members | 4 |
| III | ALLOCATION OF NET INCOME AND NET LOSS | 4 |
| | 3.1 Determination of Net Income and Net Loss | 4 |
| | 3.2 Net Loss Allocation | 4 |
| | 3.3 Net Income Allocation | 4 |
| | 3.4 Withdrawal or Reduction of Capital Contributions | 5 |
| | 3.5 Priority and Return of Capital | 5 |
| IV | MEMBERSHIP RIGHTS AND INTERESTS | 5 |
| | 4.1 Information | 5 |
| | 4.2 Interests; Voting and Non-Voting | 5 |
| | 4.3 Annual Meeting | 5 |
| | 4.4 Special Meetings | 5 |
| | 4.5 Place of Meetings | 5 |
| | 4.6 Notice of Meetings | 6 |
| | 4.7 Record Date | 6 |
| | 4.8 Proxies | 6 |
| | 4.9 Quorum | 6 |
| | 4.10 Action by Members Without a Meeting | 6 |
| | 4.11 Waiver of Notice | 7 |
| | 4.12 No Certificates | 7 |

TABLE OF CONTENTS (Continued)

DULIU01\6555B9\3

R01145

Articles                                                                                      Page

V       MANAGEMENT .................................................................................... 7

        5.1    Management by Managers ........................................................... 7
        5.2    Appointment of Officers ............................................................... 7

VI      DISTRIBUTIONS ................................................................................. 8

        6.1    Distributions ................................................................................ 8
        6.2    Offset ........................................................................................... 8
        6.3    Limitation Upon Distributions ..................................................... 8
        6.4    Interest on and Return of Capital Contributions ....................... 8
        6.5    Accounting Period ....................................................................... 8

VII     TAXES ................................................................................................. 8

        7.1    Tax Returns ................................................................................. 8
        7.2    Tax Elections ............................................................................... 8
        7.3    Tax Matters Representative ........................................................ 9

VIII    WITHDRAWALS ................................................................................. 9

        8.1    No Withdrawals Permitted .......................................................... 9

IX      TRANSFERABILITY ........................................................................... 9

        9.1    General ........................................................................................ 9
        9.2    Offer to Purchase ....................................................................... 9
        9.3    Rights of First Refusal ................................................................ 9
        9.4    Involuntary Transfers ................................................................ 10
        9.5    Valuation of Interests ............................................................... 11
        9.6    Closing ...................................................................................... 11
        9.7    Transferee Not a Member ........................................................ 12
        9.8    Life Insurance ........................................................................... 12

BULIB01\6355899\3

R01146

TABLE OF CONTENTS (Continued)

| Articles | | | Page |
|---|---|---|---|
| X | DISSOLUTION | | 13 |
| | 10.1 | Dissolution | 13 |
| | 10.2 | Winding Up | 13 |
| | 10.3 | Articles of Dissolution | 13 |
| | 10.4 | Deficit Capital Account | 13 |
| | 10.5 | Nonrecourse to Other Members | 13 |
| | 10.6 | Termination | 13 |
| XI | GENERAL PROVISIONS | | 14 |
| | 11.1 | Notices | 14 |
| | 11.2 | Integration | 14 |
| | 11.3 | Amendments | 14 |
| | 11.4 | Headings | 14 |
| | 11.5 | Waiver | 14 |
| | 11.6 | Severability | 14 |
| | 11.7 | Binding | 14 |
| | 11.8 | Governing Law | 14 |
| | 11.9 | Force Majeure | 14 |

BULIBO1\65558P\3

R01147

OPERATING AGREEMENT

THIS OPERATING AGREEMENT ("Agreement") of TOURIST SERVICES, LLC (the "Company"), effective April _____, 2006, is by and between FRANK PARLATO on behalf of a New York corporation to be formed having an address at 360 Rainbow Boulevard South, Niagara Falls, New York 14303 ("FPInc") and RH·NIAGARA BUILDING LLC., a New York limited liability company having an address at 2730 Transit Road, West Seneca, New York 14225 ("RH") (FPInc and RH sometimes individually referred to by their respective names or "Member" and collectively as "Members").

WHEREAS, the Members have caused the Company to be formed as a limited liability company pursuant to Limited Liability Company Act of the State of New York (the "Act") for any lawful purpose but have agreed that they will use the Company for the sole and limited purpose of constructing, maintaining and operating a travel information and/or retail vendor facilities and associated surface only parking lot on real property to be leased by the Company and for no other purpose; and

WHEREAS, the Members desire to enter into this Agreement to set forth in writing each Member's rights and obligations with respect to the Company.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, the parties hereto, intending to be legally bound, agree as follows·

ARTICLE I
DEFINITIONS

1.1     Definitions.    In this Agreement, the following terms shall have the meanings set forth below:

(a)     "Act" shall mean the New York Limited Liability Company Act, as from time to time in effect.

(b)     "Articles of Organization" shall mean the Articles of Organization of the Company filed with the New York Secretary of State on or about April 13, 2006, as they may from time to time be amended.

(c)     "Capital Account" shall mean, with respect to each Member, an account established for each Member, which shall consist of:

(i)     the amount of money contributed by the Member to the Company increased by

(ii)    the fair market value of property contributed by the Member to the Company (net of liabilities to which the property is subject), and

BULI001655556V3

–1–

R01148

(iii)  the amount of income allocated to the Member under Article III of this Agreement, and decreased by

(iv)  the amount of money distributed to the Member,

(v)  the fair market value of property which may be distributed to the Member by the Company (net of liabilities to which the property is subject),

(vi)  the Member's share of expenditures of the Company,

(vii)  the Member's share of amounts paid or incurred by the Company to organize the Company or to promote the sale of (or to sell) an interest in the Company (except to the extent properly amortizable for tax purposes), and

(viii)  the amount of loss allocated to the Member

(d)  "Capital Contribution" shall mean any contribution by a Member to the capital of the Company in cash, or the fair market value of property contributed by a Member to the capital of the Company.

(e)  "Code" shall mean the Internal Revenue Code of 1986, as amended.

(f)  "Company" shall mean Tourist Services, LLC.

(g)  "Distribution" means any cash and other property paid to a Member by the Company from the operations of the Company, but shall not include any assets of the Company distributed to a Member as a result of dissolution as further described in Article X below or any proceeds generated from the sale of Company assets.

(h)  "Fiscal Year" shall mean the fiscal year of the Company, which shall be the year ending December 31.

(i)  "Interest" shall mean a right of a Member in the Company, including, without limitation, (i) the right to a share of the profits and losses of, and the rights to receive distributions from, the Company; and (ii) the right to inspect the Company's books and records. "Interest" may be a voting or non-voting Interest, as described in Section 4.2 of this Agreement

(j)  "Manager" shall have the meaning provided in Section 5.1 of this Agreement

(k)  "Member" shall mean those Persons listed in the preamble of this Agreement and each Person who or which may hereafter become admitted as a Member in

-2-

R01149

accordance with the terms of this Agreement, as listed on Exhibit A of this Agreement as amended from time to time.

(l)     "Net Income" shall be computed in accordance with Section 3.1 of this Agreement.

(m)     "Net Loss" shall be computed in accordance with Section 3.1 of this Agreement

(n)     "Officer" shall have the meaning provided in Section 5.2 of this Agreement.

(o)     "Percentage Allocation" means, for each Member, the percentage equal to the ratio which such Member's Interests bear to all outstanding Interests.

(p)     "Person" shall mean any person or corporation, governmental authority, limited liability company, partnership, limited partnership, limited liability partnership, trust, unincorporated association or other entity.

(r)     "Selling Member" shall mean a Member disposing of any of such Member's interests.

(s)     "Treasury Regulations" shall mean all proposed, temporary, and final regulations from time to time in effect under the Code.

## ARTICLE II
## ORGANIZATION

2.1     Name.  The name of the Company is "TOURIST SERVICES, LLC."

2.2     Principal Place of Business.  The principal place of business of the Company within the State of New York shall be located at 360 Rainbow Boulevard South, Niagara Falls, New York 14303.  The Company may establish any other places of business as the Members or Managers may from time to time deem advisable.

2.3     Limited Liability.  No Member, Manager, Officer, or agent of the Company (including any Person having more than one such capacity) shall be liable for any debts, obligations, or liabilities of the Company or each other, whether arising in tort, contract, or otherwise, solely by reason of being such Member, Manager, Officer, or agent or acting (or omitting to act) in such capacities or participating (as a Manager, Officer, employee, consultant, contractor, or otherwise) in the conduct of the business of the Company, *provided, however,* that such limitation of liability shall not apply to any such Member, Manager, Officer, or agent that is found to have engaged in intentional wrongdoing, fraud, deceit or deliberate dishonesty or whose acts were committed in bad faith  Without limiting the generality of the foregoing, no Member

-3-

BUL:B01\6555890

R01150

shall have any liability to restore or replenish all or any portion of a deficit balance in a Capital Account.

2.4     Initial Capital Contributions.  The Members have agreed to contribute to the Company the property shown following such Member's name on Exhibit B and shall be obligated to contribute to the Company such property as otherwise determined by the unanimous consent of the Members.  In consideration, the Members shall be deemed to own the voting Interests shown following such Member's name on Exhibit B.  Additional contributions of Members and contributions of any new Members shall be set forth on Exhibit B as amended from time to time.

2.5     Additional Contributions.  No Member shall be required to make any capital contributions in addition to those called for by Section 2.4 above

2.6     Price For Additional Interest.  For any new or additional Interest granted by the Company after the initial capital contributions specified on Exhibit B to this Agreement as of the date of this Agreement, in the absence of fraud in the transaction, the vote of the Members as to the price for each such Interest and the value of the consideration received for each such Interest shall be conclusive.

2.7     New Members.  A Person may be admitted as a Member after the date of this Agreement only upon the unanimous vote of, and upon such terms and conditions approved by, the Members. Such Person shall have allocated to such Person's Capital Account income, loss, and other items from the date of such Person's admission.  The number and nature of such Person's Interests in the Company shall be determined at the time of admission, and will become effective on the later of the date of such vote or the date the Company receives such Person's written consent to be bound as a Member by the terms of this Operating Agreement

## ARTICLE III
## ALLOCATION OF NET INCOME AND NET LOSS

3.1     Determination of Net Income and Net Loss.  The Net Income or Net Loss of the Company shall be determined and allocated to the Members annually, in accordance with the accounting method followed for federal income tax purposes and otherwise in accordance with generally accepted accounting principles and procedures applied in a consistent manner.

3.2     Net Loss Allocation.  Losses, deductions, and tax credits for each Fiscal Year from operations of the Company shall be allocated in accordance with the Members' Percentage Allocations.

3.3     Net Income Allocation.  Net Income shall be allocated among the Members in accordance with the Percentage Allocations.

-4-

BUL0801655389.3

R01151

3.4     Withdrawal or Reduction of Capital Contributions.  A Member shall not receive from the Company any repayment of a Capital Contribution until all indebtedness and liabilities of the Company (except any indebtedness, liabilities, and obligations to Members on account of their Capital Contributions) have been paid or there remains property of the Company, in the sole discretion of the Company, sufficient to pay them, and agreed upon by the Members.

3.5     Priority and Return of Capital.  No Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Net Income, Net Loss, or Distributions, except as otherwise provided for in Article VI below.  This Section 3.5 shall not apply to any loan or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

## ARTICLE IV
## MEMBERSHIP RIGHTS AND INTERESTS

4.1     Information.  Each Member may inspect and copy, at such Member's own expense, during ordinary business hours, at the principal place of business of the Company, the Articles of Organization, this Operating Agreement, the tax returns of the Company for the three most recent Fiscal Years, and such other information as may be required to be available to the Members by Section 1102 or any other provision of the Act.

4.2     Interests; Voting and Non Voting.  An Interest shall be either a voting Interest or a non-voting Interest.  A voting Interest and a non-voting Interest shall be of equal rank and shall entitle the holders thereof of the same rights and privileges, but the non-voting Interests shall confer no voting power, all rights to vote and all voting power being vested exclusively in the voting Interests.  A Member may hold both voting Interests and non-voting Interests, but shall have the right to vote solely with respect to such Member's voting Interests.  In voting on any matter, each Member shall vote in proportion to the voting Interests, if any, held by such Member.  The vote of Members holding a majority of voting Interests shall be the act of the Members, unless the approval of all Members, whether holding voting Interests or non-voting Interests, is otherwise expressly required by a provision of this Agreement

4.3     Annual Meeting.  An annual meeting of the Members may be held each year by vote of the Members at such time as shall be determined by vote of the Members for the purpose of the transaction of any business as may come before such meeting.

4.4     Special Meetings.  Special meetings of the Members, for any purpose or purposes, may be called by Members holding not less than twenty percent of the voting Interests

4.5     Place of Meetings.  A Meeting of the Members may be held at any place, within or outside the State of New York, designated in the notice of such meeting.  If no such designation is made, the place of any such meeting shall be the principal place of business of the Company.

BUUJ0016SSSB9U

R01152

4.6     Notice of Meetings.  Written notice stating the place, day and hour of the meeting indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called, shall be delivered to each Member no fewer than three or more than sixty days before the date of the meeting.

4.7     Record Date.  For the purpose of determining the Members entitled to notice of or to vote at any meeting of the Members or any adjournment of such meeting, or Members entitled to receive payment of any Distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring a Distribution is adopted, as the case may be, shall be the record date for making such a determination.  When a determination of Members with voting Interests entitled to vote at any meeting of Members has been made pursuant to this Section 4.7, the determination shall apply to any adjournment of the meeting.

4.8     Proxies.

(a)     A Member holding a voting Interest may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact.

(b)     Every proxy must be signed by the Member or the Member's attorney-in-fact.  No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.  Every proxy shall be revocable at the pleasure of the Member executing it.

(c)     Any proxy may be revoked, notwithstanding a provision making it irrevocable, by a purchaser of a voting Interest who has become a Member of the Company.

4.9     Quorum.  Members holding a majority of all voting Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any meeting of Members, holders of a majority of the voting Interests then present may adjourn the meeting from time to time for a stated period not to exceed sixty days without further notice.  However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member holding a voting Interest of record at such meeting.  At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.  The Members holding voting interests present at a meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of Members whose absence results in less than a quorum being present.

4.10    Action by Members Without a Meeting.  Whenever the Members of the Company are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Members holding voting Interests and delivered to the President or Secretary of the Company.

-6-

BUL:000165558V0

R01153

4.11     Waiver of Notice.   Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.   The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by such Member.

4.12     No Certificates.   The Company shall not issue certificates evidencing Interests

## ARTICLE V
## MANAGEMENT

5.1     Management by Managers.   Unless otherwise agreed to by the Members, the management of the Company shall be vested in its Managers, which shall consist of a maximum of two Persons.   The Managers shall periodically meet and discuss the business of the Company, and shall otherwise handle and deal with the business affairs of the Company from time to time as permitted by the Act.   The Managers shall each have one vote, and except as may otherwise be provided in this Agreement, all decisions of the Managers shall be by a majority vote of the Managers.   As of the date of this Agreement, the Managers shall consist of FPInc and RH, or their respective designees, until otherwise determined by the Members.   The Managers may, in their discretion, appoint "Officers," as described below, to handle the day to day affairs of the Company, subject to the direction and limitations imposed by the Managers. Notwithstanding the foregoing, in consideration of a certain loan made by RH to the Company of even date hereof as evidenced by a promissory note, a copy of which is attached hereto as Exhibit "C" (the "RH Note"), the parties hereto agree that in the event the amount of principal and interest on such Note is not paid on its due date, RH, at its option, will become the sole Manager of the Company and serve in such capacity until the loan evidenced by the RH Note is paid in full.   At such time as the RH Note is paid in full, both RH and FPInc. will revert to co-Managers   RH covenants to make all advances requested by the Maker of the RH Note, pursuant to the terms of the Note, so long as FPInc. is fully and faithfully performing its obligations pursuant to this Agreement and the Lease being executed on or about this date between the Company and One Niagara, LLC is in full force and effect

5.2     Appointment of Officers.   The Managers may appoint "Officers" of the Company, consisting of any one or more of a President, Secretary and Treasurer, and such other Officers as the Managers may determine.   The Officers shall have such titles and exercise and perform such powers and duties as shall be assigned to them by this Agreement or from time to time by vote of the Managers   Each Officer shall hold office until a successor has been appointed and qualified.   Any number of offices may be held by the same individual.   As of the date of this Agreement, the Managers hereby appoint Frank Parlato as President of the Company to handle the day-to-day affairs of the Company, including the hiring and firing of employees and contractors, handling day to day banking matters, and to perform such duties as may be assigned to him by the Managers, to serve in such capacity until the first to occur of (i) October

-7-

GUL1801\6555873

30, 2007, at which time his term as President shall end unless extended by the then Managers of the Company, (ii) a default of the RH Note; (iii) the failure of the Company to make distributions in accordance with Section 6.1 below; or (iii) by mutual consent of the Managers.

## ARTICLE VI
## DISTRIBUTIONS

6.1     Distributions.  The Company may from time to time, in its discretion, make Distributions to the Members.  All Distributions shall be made to the Members in proportion to their Percentage Allocations.  The Company shall make a mandatory distribution of no less than $200,000 to RH, each calendar year, commencing with the Fiscal Year ending December 31, 2008 (the "Mandatory Distribution").  No other Distribution other than the Mandatory Distribution shall be declared and paid to a Member until the outstanding balance on the RH Note is paid in full.

6.2     Offset.  The Company may offset amounts owing to the Company by a Member against any Distribution to be made to such Member.

6.3     Limitation Upon Distributions.  Other than the mandatory distribution set forth in Section 6.1 above, no further Distribution shall be declared and paid to a Member unless after any such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.  *TAXES - LIABILITY*

6.4     Interest on and Return of Capital Contributions.  No Member shall be entitled to interest on a Capital Contribution or to a return of a Capital Contribution, except as authorized by the Company.

6.5     Accounting Period.  The accounting period of the Company shall be the Fiscal Year, unless otherwise determined by the Members.

## ARTICLE VII
## TAXES

7.1     Tax Returns.  The Company shall cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Each Member shall in a timely manner furnish to the Company all pertinent information in such Member's possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.  The Members agree to cause the Company to be treated as a partnership for federal and state income tax purposes.

7.2     Tax Elections.  The Company shall make the following elections on the appropriate tax returns:

-8-

BULIB0145558903

R01155

(a)   To adopt the calendar year as the Fiscal Year;

(b)   Any other election that the Company may deem appropriate and in the best interests of the Members.

7.3   **Tax Matters Representative.** RH or its designee is designated to be the "tax matters partner" of the Company as that term is defined in Section 6231(a)(7) of the Code.

## ARTICLE VIII
## WITHDRAWALS

8.1   **No Withdrawals Permitted.** No Member shall withdraw from the Company prior to its dissolution and winding up. A Member shall have the right to transfer such Member's Interest in the Company, but only to the extent provided by the terms of Article IX below.

## ARTICLE IX
## TRANSFERABILITY

9.1   **General.** Except as expressly permitted in this Article IX, no Member shall give, sell, assign, pledge, hypothecate, exchange, or otherwise transfer to another Person any Interest or portion of an Interest without the written consent of all Members. Any transfer or attempt to transfer an Interest in violation of the terms of this Agreement shall be void. Notwithstanding anything set forth in this Agreement to the contrary, any Member may at any time, and from time to time, transfer all, but not less than all, of its Interests to any Affiliate of such Member. "Affiliate" means with respect to any Member, any Person that is controlled by, or under common control with the Member. Frank Parlato has executed this Agreement on behalf of a corporation to be formed, and following the formation of same, it shall be the Member, and Frank Parlato shall have no personal liability for signing this Agreement on its behalf.

9.2   **Offer to Purchase.** If a Member desires to sell all or a portion of an Interest to another Person, such "Selling Member" shall obtain from such Person a *bona fide* written offer to purchase the same, stating the terms and conditions upon which the purchase is to be made. Such Selling Member shall give written notice to the Company and to the other Members of such Selling Member's intention to sell such Interest (or portion thereof) and a copy of such *bona fide* written offer.

9.3   **Rights of First Refusal.** The Company shall have a right of first refusal to purchase all (but not less than all) of the Interests or portion thereof proposed to be sold by the Selling Member at the same price and upon the same terms and conditions as stated in, at the option of the remaining Members, either (a) the *bona fide* written offer or (b) Sections 9.5 and 9.6 below, by giving written notice to the Selling Member of its intention to do so within thirty

-9-

R01156

days after receiving written notice from the Selling Member.  For purposes of this Section 9.3, only the Members other than the Selling Member shall have the right to vote with respect the Company's exercise of such right of first refusal.  If the Company does not exercise its right of first refusal within such thirty-day period, then, commencing at the close of such thirty-day period, the remaining Members shall have a thirty-day right of refusal, exercisable in the same manner and upon the same terms and conditions as the Company's right, to purchase all (but not less than all) of such Interests.  The Members desiring to purchase such Interests shall, as among themselves, have the right to purchase the number of such Interests which is proportionate to the numbers and kinds of such Interests owned by such Members.  If no Member shall so notify the Selling Member of a desire to exercise such right of first refusal within such thirty-day period, then such right of first refusal shall terminate, and the Selling Member shall be entitled to consummate the sale of its Interests or portion thereof.  If the Selling Member does not sell its Interests or portion thereof within thirty days after receiving the right to do so, the right to do so shall terminate and the terms and conditions of this Section shall again be in effect with respect to all Interests.

       9.4      **Involuntary Transfers.**  In the event that:

       (a)      voluntary proceedings by, or involuntary proceedings against, a Member are commenced under any provision of any federal or state statute concerning bankruptcy, insolvency, arrangement, composition, reorganization, moratorium, or similar relief, and such proceedings are not dismissed within sixty days; or

       (b)      any of the Interests of a Member are attached; or

       (c)      any judgment is obtained in any legal or equitable proceeding against a Member, and the sale of any Interests is sought as a result of such judgment, and such judgment is not stayed pending appeal or satisfied; or

       (d)      any execution process is issued against a Member or against any Interests; or

       (e)      any other form of action or proceeding is concluded which would result in the sale or transfer, either voluntarily or involuntarily, of any Interests;

BULIB01\6555893

R01157

then the Member who owns such Interests shall within two business days give notice of such event to the Company and the other Members. Commencing on the date of notice of occurrence of such event, the Company shall then have a thirty-day option, exercisable by written notice to the affected Member, to purchase all or a portion of the Interests of the affected Member, at the prices determined in accordance with Section 9.5 below. In the event that the affected Member shall fail or refuse to give such notice, notice shall be deemed to have been given upon the Company so doing. If the Company does not exercise its option to purchase during such thirty-day period, or if the Company fails to close the purchase of all of such Interests pursuant to such option, then, commencing at the close of such thirty-day period, the remaining Members shall have a thirty-day option, exercisable in the same manner and upon the same terms and conditions as the Company's option, to purchase all of such Interests in proportion to the number of Interests owned by each remaining Member immediately prior to such period. If, however, the Member whose Interests are affected by the event shall, within thirty days after giving notice pursuant to this Section 9.4, cure or remove the condition giving rise to an option to purchase such Member's Interests under this Section 9 4, then the options to purchase under this Section shall lapse.

      9.5     Valuation of Interests. In the case of transfers of Interests subject to Section 9.4 above, if a transferor and transferee are unable to agree upon a dollar value of such Interests within thirty days after either the transferor or the transferee delivers a written request to the other to come to an agreement upon such value, then the dollar value shall be determined as follows:

      Within sixty days after the delivery of the written request to agree upon a value, the transferor and transferee shall agree on the selection of a reputable appraiser experienced in the valuation of businesses of the type then conducted by the Company. The appraiser shall, within sixty days of selection, appraise the value of the Company, and shall deliver a written report of such appraisal to the transferor and the transferee. The purchase price of the Interests to be transferred shall be the value of the Company multiplied by the transferor's Percentage Allocation in the Company. In the event the transferor and the transferee are unable to agree on an appraiser, then the transferor and transferee shall each select an appraiser, who shall be reputable and experienced in the valuation of closely held businesses of the type then conducted by the Company The two appraisers shall, within sixty days of their respective selections, appraise the value of Company being transferred in accordance with the criteria set forth above and shall deliver written reports to the transferor and the transferee and the two appraisers shall within fifteen days meet to reconcile their appraisals and agree upon one appraisal The two appraisers shall be permitted to discuss their respective appraisals with each other while they are preparing the same. If the two appraisers agree, then the value of the Company shall be the value agreed upon by the appraisers. If the two appraisers cannot agree upon an appraised value of the Company, but are within ten percent (10%) of each other, then the purchase price for the Interests being transferred shall be (i) the arithmetic average of the two appraised values for the Company multiplied by (ii) the transferor's Percentage Allocation in the Company (that is, the sum of the two values, divided by two, multiplied by the transferor's Percentage Allocation of the Company). If the appraisals of the two appraisers are not within ten percent of each other,

-11-

R01158

then the Members shall select two other appraisers, and such process shall be continued until the valuation is resolved in accordance with this procedure.

Such value shall be binding upon all parties to this Agreement and their representatives, successors, and assigns. The parties acknowledge that the procedure set forth herein for determining the value of their Interests is fair and reasonable and is the result of arms length and good faith negotiations.

9.6     Closing. The closing of a purchase and sale under Section 9.4 shall be held within sixty days after the acceptance of the offer or deemed offer to sell. At least twenty per cent of the purchase price shall be paid in cash or by certified check. The balance shall be paid, in sixty consecutive equal monthly installments of principal with interest, with the first installment to be due on the first day of the calendar month immediately following the calendar month in which the closing occurs and each succeeding installment to be due on the first day of each succeeding month. The obligation to pay the balance of the purchase price shall be evidenced by a unsecured non-negotiable promissory note payable to the order of the Selling Member and providing for: (a) interest at a rate per annum equal to the rate payable on United States Treasury securities of comparable maturity (determined at the time of closing), plus two per cent; (b) the right of prepayment without penalty; and (c) acceleration of the entire unpaid principal balance in the event of a default in the payment of principal or interest for more than ten days after notice and demand. Such promissory note shall be executed and delivered at the closing.

9.7     Transferee Not a Member. No Person acquiring an Interest pursuant to this Article IX other than a Member shall become a Member unless such Person is approved by the vote of the Members and has agreed in writing to the terms of this Operating Agreement.

9.8     Life Insurance. The Company may purchase policies of insurance on the life of each of the Members generally sufficient to enable the Company to purchase the Interests of each Member at the value established pursuant to Section 9.5 above in the event of such Member's death. All policies shall be detailed on an Exhibit which will be attached to this Agreement.

(a)     The Company shall be the owner of any and all policies of life insurance acquired pursuant to the terms of this Agreement, but no right of ownership shall be exercised unless written notice of the intention to exercise such right is given to the insured. The Company shall have custody of all policies acquired pursuant to the terms of this Agreement and shall be named as revocable beneficiary of all such policies.

(b)     The Company agrees to pay the premiums on the policies which it owns pursuant to the terms of this Agreement for so long as the parties hereto determine to continue such policies in effect and to give proof of such payment to the insured within twenty days after the due date of each premium. Upon the failure of the Company to pay as agreed a premium when it becomes due, then the insured shall have the right to pay the premium and to be reimbursed therefor by the Company. The parties hereto authorize any insurer to give the

R01159

insured any information requested by such insured with respect to the policy or policies on such insured's life owned by the Company.

(c)     If either Member transfers all of such Member's Interests in the Company, either voluntarily or involuntarily, or if the Company is dissolved for any cause, whether or not set forth in Article X of this Agreement, then transferring Member, or both Members if the Company is dissolved, shall have the right to purchase the policy or policies upon such Member's life owned by the Company.  The purchase price for the policy or policies shall be the interpolated terminal reserve value of such policy or policies as of the date or sale, less any existing indebtedness against such policy or policies, plus that portion of the premium or premiums on such policy or policies paid prior to the date of sale which covers a period beyond the date of sale.  This right of purchase must be exercised by the purchaser within thirty days after the date of transfer of the Interests or the date he receives notice of the dissolution of the Company.  Upon the exercise of this right, the purchaser shall deliver to the Company, and the Company shall simultaneously execute and deliver to the purchaser, all the documents which are required to transfer ownership of the policy or policies.  If this right of purchase is not exercised within the time prescribed by this Section 9.8(c), the Company may make whatever disposition of the policy or policies it shall deem proper.

## ARTICLE X
## DISSOLUTION

10.1     Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon the vote of the Members.

10.2     Winding Up.  Upon the dissolution of the Company, the Members may, in the name of and for an on behalf of the Company and by vote of the Members, prosecute and defend suits, whether civil, criminal or administrative, settle and close the Company's business, dispose of and convey the Company's property, dissolved discharge the Company's liabilities and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members.  Upon winding up of the Company, the assets shall be distributed as follows:

(a)     To creditors, including any Member who is a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves;

(b)     To Members and former Members in satisfaction of liabilities for Distributions; and

(c)    . To Members first for the return of their Capital Contributions, to the extent not previously returned, and second respecting their Interests, in proportion to their Percentage Allocation.

BUL:B01\6555890\3

-13-

R01160

10.3     Articles of Dissolution.  Within ninety days following the dissolution and the commencement of winding up of the Company, articles of dissolution shall be filed with the New York Department of State pursuant to the LLC Law.

10.4     Deficit Capital Account.  Upon a liquidation of the Company, if any Member has a deficit in its Capital Account, the Member shall have no obligation to make any Capital Contribution, and the negative balance of any Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose; provided, however, that the Member shall repay any loan to the Member by the Company.

10.5     Nonrecourse to Other Members.  Upon dissolution, each Member shall receive a return of such Member's Capital Contribution solely from the assets of the Company. If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return in full any Capital Contribution of any Member, such Member shall have no recourse against any other Member.

10.6     Termination.  Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

## ARTICLE XI
## GENERAL PROVISIONS

11.1     Notices.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, telecopied or mailed by registered or certified mail, to the addresses set forth in the preamble to this Agreement or to such other address of which any party shall give the other parties notice as provided in this Section 11.1.  All such notices shall be deemed to have been given when received.

11.2     Integration.  This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect thereto, whether or not relied or acted upon.

11.3     Amendments.  No amendment to this Agreement shall be effective unless made in a writing duly executed by two-thirds of all the Members, both Members holding voting Interests and Members holding non-voting Interests.

11.4     Headings.  The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement

11.5     Waiver.  No failure of the Company or any Member to exercise, and no delay in exercising, any right or remedy under this Agreement shall constitute a waiver of such

BULIB01\6555893

R01161

right or remedy.  No waiver of any right or remedy under this Agreement shall be effective unless made in writing.

11.6    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other provision being prohibited or invalid.

11.7    Binding.  This Agreement shall be binding upon the Company and all Members and their respective successors and assigns, and shall inure to the benefit of the Company and all Members and each permitted successor and assignee of any Member.

11.8    Governing Law.  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflict of laws.

11.9    Force Majeure.  Neither party to this Agreement shall be liable if the performance of any part or all of this Agreement is, for a period of no longer than 180 days, prevented, delayed, hindered or otherwise made impracticable or impossible by reason of any strike, flood, riot, fire, explosion, war, act of God, sabotage, accident or any other casualty or cause beyond either party's control, and which cannot be overcome by reasonable diligence and without extraordinary and prohibitive expense.

IN WITNESS WHEREOF, the undersigned have caused this Operating Agreement to be executed as of the day first above written.

FPINC

By: _____
Name:
Title:

GULIB01\6555890

-15-

R01162

RH NIAGARA BUILDING LLC

By:

Name: Gordon Reed

Title: Manager of Romus LLC as
Manager of RH Niagara Building LLC

-16-

R01163

EXHIBIT A

MEMBERS

FPInc
RH Niagara Building LLC

BULID0116535890

R01164

EXHIBIT B

INITIAL CAPITAL CONTRIBUTIONS

| Member | Contribution | Number of Interests |
|---|---|---|
| FP Inc. | $100 | 50 Voting |
| RH Niagara Building LLC | $100 | 50 Voting |

BUL1D01\6555893

R01165



RIDER #1

## OPERATING AGREEMENT

### OF

### ONE NIAGARA PLAZA, LLC

(the "Company")

THIS OPERATING AGREEMENT shall be effective the 1st day of November 2004, by and among (i) the Company, (ii) WHITESTAR DEVELOPMENT CORPORATION ("Whitestar") with an office at 8080 Tonawanda Creek Road, Clarence, New York 14051, and (iii) INCREDIBLE INVESTMENTS LIMITED, a British Virgin Islands company with an office at Units 1605-1616 16th Floor, The Metropolis Tower, 10 Metropolis Drive, Hunghom, Kowloon, Hong Kong, ("IIL") Each of Whitestar and IIL are sometimes individually referred to by their respective name or as a "Member" and together as the "Members".

### WITNESSETH:

WHEREAS, the Company was formed on or about November 23, 2004 as a limited liability company pursuant to the Limited Liability Company Act of the State of New York (the "Act"); and

WHEREAS, the Members desire to enter into this Agreement for the purpose of confirming various agreements which they have reached pertaining to their respective membership interests in the Company and various matters pertaining to the management and operation of the Company, and in order to otherwise comply with the requirements of the Act; and

NOW, THEREFORE, in consideration of the above premises and the terms and conditions herein contained, the parties hereto, intending to be legally bound, agree as follows:

### ARTICLE I

### Definitions

1.1    As used herein, the following terms and phrases shall have the meanings indicated:

A.    "Capital Account" shall mean, with respect to each Member, the account established for each Member pursuant to Section 6.1, which will initially equal the Capital Contributions of such Member and will be (a) increased by the amount of Net

Profits allocated to such Member and (b) reduced by the amount of Net Losses allocated to such Member and the amount of Cash Flow distributed to such Member. Members' Capital Accounts shall be determined and maintained in accordance with the rules of paragraph (b)(2)(iv) of Regulation Section 1.704-1 of the Code.

B.    "Capital Contributions" shall mean the fair market value of the amounts contributed by the Members pursuant to Section 6.1.

C.    "Cash Flow" shall have the meaning provided in Section 7.1.

D.    "Member" shall have the meaning set forth in Section 3.1 below.

E.    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent revenue laws.

F.    "Managers" shall mean the Person or Persons selected by the Members in accordance with this Agreement to serve as Managers of the Company. The use of the term Managers does not mean that more than one Person need to be elected as a manager of the Company, it being expressly agreed that one Person may serve as the sole Manager of the Company.

G.    "Net Profits" and "Net Losses" shall mean the net profit or net loss, respectively, of the Company determined in accordance with Section 8.1.

H.    The words "membership interest" shall mean a Member's interest in the Company.

I.    "Person" shall mean any natural person, corporation, partnership, joint venture, association, limited liability company or other business or legal entity.

## ARTICLE II

### Organization of the Company

2.1    The Members acknowledge the filing with the offices of the Secretary of State of New York of Articles of Organization of the Company for the purpose of forming a New York limited liability company in compliance with the Act. The Members shall cause such additional filings and publications to be made, as may be required by the Act in order to complete the formation of the Company. The purpose of the Company is to conduct any lawful business for which limited liability companies may be organized and to do all things necessary or useful in connection with the foregoing. The Members acknowledge, however, that they have caused the Company to be formed solely for the purpose of undertaking the Project described in Rider #1 to this Agreement, and that the

Company shall not engage in other lines of business except upon the unanimous consent of all of the Members.

2.2    The Company may conduct business under its name, and one or more assumed names, as determined by the Managers.

2.3    The principal office of the Company shall be located at 360 Rainbow Boulevard South, Niagara Falls, New York, or such other place as the Managers may designate from time to time.  The Company may maintain such other offices as the Managers may determine.

2.4    The Company shall continue indefinitely, unless and until dissolved pursuant to this Agreement or in accordance with the Act.

## ARTICLE III

### Status of Members

3.1.    The Company shall have one class of members, and each Member shall have all rights of membership granted by the Act. No Member will be bound by, or be personally liable for the expenses, liabilities or obligations of the Company.

3.2.    No Member will be entitled to withdraw any part of his Capital Account or to receive any distributions from the Company except as expressly provided in this Agreement.

3.3.    No Member will have the right to require partition of the Property or any other real property owned by the Company or, except as otherwise specifically set forth in this Agreement,  to compel any sale or appraisal of the Company's assets, notwithstanding any provision of law to the contrary.

3.4.    No Member shall be obligated to devote all or any substantial part of his time to the business of the Company and shall only be obligated to devote such time as may be reasonably necessary to further the business of the Company.

## ARTICLE IV

### Meeting of Members

4.1.    An annual meeting of Members shall be held within three (3) months after the close of the fiscal year of the Company on such date and at the time and place (either within or without the State of New York) as shall be fixed by the Members.  At the annual meeting, the Members shall elect the Managers and transact such other business as may properly be brought before the meeting.

4.2.     A special meeting of Members may be called at any time by the Managers and shall be called by the Managers at the request in writing of a majority in interest of the Members.  Any such request shall state the purpose or purposes of the proposed meeting.  Business transacted at any special meeting of Members shall be confined to the purposes set forth in the notice thereof.

4.3.     Written notice of the time, place and purpose of every meeting of Members (and, if other than an annual meeting, the person or persons at whose discretion the meeting is being called), shall be given by the Managers to each Member of record, not less than ten (10) nor more than sixty (60) days prior to the date set for the meeting.  Notice shall be given either personally or by mailing said notice by first class mail to each Member at his address appearing on the record book of the Company or at such other address supplied by him in writing to the Managers of the Company for the purpose of receiving notice.

A written waiver of notice setting forth the purposes of the meeting for which notice is waived, signed by the person or persons entitled to such notice, whether before or after the time of the meeting stated therein, shall be deemed equivalent to the giving of such notice.  The attendance by a Member at a meeting either in person or by proxy without protesting the lack of notice thereof shall constitute a waiver of notice of such Member.

All notices given with respect to an original meeting shall extend to any and all adjournments thereof and such business as might have been transacted at the original meeting may be transacted at any adjournment thereof; no notice of any adjourned meeting need be given if an announcement of the time and place of the adjourned meeting is made at the original meeting.

4.4.     The holders of a majority in interest of the Members, shall be requisite and shall constitute a quorum at all meetings of members except as otherwise provided by statute or the Articles of Organization. If, however, a quorum shall not be present or represented at any meeting of Members, the Members present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.  When a quorum is once present to organize a meeting, such quorum is not deemed broken by the subsequent withdrawal of any Members.

4.5.     Every Member entitled to vote at any meeting shall be entitled to vote in accordance with his membership interest in the Company held by him, of record on the date fixed as the record date for said meeting and may so vote in person or by proxy.  Any Company action shall be authorized by a majority in interest of the votes cast by the Members entitled to vote thereon except as may otherwise be provided by statute, the Articles of Organization or this Operating Agreement.

4.6.   Every proxy must be signed by the Member entitled to vote or by his duly authorized attorney-in-fact and shall be valid only if filed with the Managers of the Company prior to the commencement of voting on the matter in regard to which said proxy is to be voted.  No proxy shall be valid after the expiration of eleven months from the date of its execution unless otherwise expressly provided in the proxy.  Every proxy shall be revocable at the pleasure of the person executing it except as otherwise provided by statute.  Unless the proxy by its terms provides for a specific revocation date and except as otherwise provided by statute, revocation of a proxy shall not be effective unless and until such revocation is executed in writing by the Member who executed such proxy and the revocation is filed with the Managers of the Company prior to the voting of the proxy.

4.7.   All meetings of Members shall be presided over by the Managers, or if not present, by a Member thereby chosen by the Members at the meeting.  The Managers or the person presiding at the meeting shall appoint any person present to act as secretary of the meeting.

4.8.   For the purpose of determining the Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof or to express consent or dissent from any proposal without a meeting, or for the purpose of determining the Members entitled to receive payment of any distribution of Cash Flow or the allotment of any rights, or for the purpose of any other action, the Members may fix, in advance, a date as the record date for any such determination of Members.  Such date shall not be more than fifty (50) nor less than ten (10) days before the date of any meeting nor more than fifty (50) days prior to any action taken without a meeting, the payment of any distribution of Cash Flow or the allotment of any rights, or any other action.  When a determination of Members of record entitled to notice of, or to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof, unless the Members fix a new record date under this Section for the adjourned date.

4.9.   The Company shall be entitled to treat the holder of record of any membership interest as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such membership interest on the part of any other person whether or not it shall have express or other notice thereof, except as otherwise provided by the Act.

ARTICLE V

Management

5.1.   Management of the Company shall be vested in Managers to be elected by the Members.  The Company shall have no fewer than 1 Manager nor more than 5 Managers, as determined by the Members.  The initial sole Manager of the Company shall be Frank Parlato.  The Managers shall periodically meet and discuss the business of the Company,

and shall otherwise handle and deal with the business affairs of the Company from time to time as permitted by the Act. Each Manager shall have one vote, and except as otherwise provided in this Agreement, all decisions of the Managers shall be by a majority of votes cast. A Member who is an individual shall not be prohibited from being a Manager; provided in his or her capacity as a member, he or she may not take part in or interfere in any manner with the conduct or control of the business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

5.2.    The Managers shall hold office for the term for which elected and until a successor has been elected and qualified. A vacancy in the office of Manager arising from any cause may be filled for the unexpired portion of the term by the Members entitled to vote.

5.3.    Any Manager may resign at any time by giving written notice to the Members. Any such resignation shall take effect at the time specified therein or, if the time is not specified therein, upon the receipt thereof, irrespective of whether any such resignations shall have been accepted.

5.4.    The Company shall be managed by the Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Managers in accordance with this Agreement. In addition to and not in limitation of any rights and powers conferred by law or other provisions of this Agreement, the Managers shall have and may exercise on behalf of the Company all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits. Such powers shall include, without limitation, the following:

      A.    To open accounts and deposit and maintain accounts in the name of the Company in banks or savings and loan associations;

      B.    To determine the appropriate accounting method or methods to be used by the Company;

      C.    To commence lawsuits and other proceedings;

      D.    To retain accountants, attorneys or other agents to act on behalf of the Company;

      E.    To execute, acknowledge and deliver any and all instruments to effectuate the foregoing, and to take all such action in connection therewith as the Managers deem necessary or appropriate.

5.5.   One of the Managers, as determined by them, shall serve as Tax Matters Member as such term is defined in Code Section 6231 (a)(7).

5.6.   Any person made or threatened to be made a party to an action or proceeding, whether civil or criminal, by reason of the fact that he, his testator or intestate, then, is, or was a manager, Member, employee or agent of the Company, or then serves or has served on behalf of the company in any capacity at the request of the Company, shall be indemnified by the Company against reasonable expenses, judgments, fines and amounts actually and necessarily incurred in connection with the defense of such action or proceeding or in connection with an appeal therein, to the fullest extent permissible by the Act.  Such right of indemnification shall not be deemed exclusive of any other rights to which such person may be entitled.

## ARTICLE VI

### Capital

6.1.   The Members shall contribute to the Company in exchange for their membership interests the cash and other property described on Schedule A attached hereto.

6.2.   Except as expressly provided in this Agreement, no Member shall be required to make any additional contributions to the capital of the Company.

6.3.   No interest shall be paid on the Capital Account of any Member.

6.4.   A Capital Account shall be established for each Member on the books and records of the Company in accordance with Section 1.1.A.  If any assets of the Company are distributed to the Members in kind, the Capital Accounts of the Members shall be adjusted to reflect the difference between the fair market value of such assets on the date of distribution and the basis of the Company in such assets.

6.5.   In the event any Member shall hereafter make a loan to the Company, the same shall be evidenced by one or more promissory notes, executed by the Company and delivered to the applicable Member(s), which note(s) shall set forth the terms of repayment thereof.

6.6   The Capital Accounts of the Members are to be maintained in accordance with the Code and the Treasury Regulations, including without limitation the alternative test for economic effect set forth in Reg. §1.704-1(b)(2)(ii)(d) and the minimum gain chargeback provisions of Reg. §1.704-2.  Nothing in this Agreement is intended to create a deficit restoration obligation or otherwise impose personal liability on a Member for a deficit in his or her Capital Account.  Without limiting the generality of the foregoing:

(a) If an allocation of loss or other allocation pursuant to Section 8.2 including expenditures described in Code Sec. 705(a)(2)(B) would cause or increase a deficit in a

Member's Capital Account as defined in Reg. §1.704-1(b)(ii)(d) and Reg. §1.704-2, as may be amended from time to time, then the amount of the loss or other allocation which would have caused or increased a deficit in a Member's Capital Account shall be allocated instead to the Capital Accounts of the other Members which would not have a deficit in their Capital Accounts as a result of the allocation, in proportion to their respective interests, or, if no such Members exist, then to the Members in accordance with their allocation of Profits pursuant to Section 8.2 below.

(b) If any Member unexpectedly receives any adjustments, allocations, or distributions described in Reg. §1.704-1(b)(2)(ii)(d)(4), (5), or (6), which create or increase a deficit in his or her Capital Account, then items of the Company's income and gain for such year and, if necessary, for subsequent years shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in the Capital Account as quickly as possible. Any such allocations shall be made pro rata. It is the intent that this section be interpreted to comply with the alternate test for economic effect set forth in Reg. §1.704-1(b)(2)(ii)(d).

## ARTICLE VII

### Distributions of Cash

7.1     The Managers shall periodically determine the amount of cash of the Company which is not required for the operation or the reasonable working capital and other reserve requirements of the Company (such cash is sometimes referred to herein as "Cash Flow"), and shall endeavor to make periodic distributions of Cash Flow to the Members, to be allocated among them in accordance with their membership percentages from time to time.

## ARTICLE VIII

### Profits and Losses

8.1.    The Net Profits and Net Losses of the Company shall be the net profits and net losses of the Company as determined for Federal income tax purposes.

8.2     The profits and losses of the Company shall be allocated to the Members in accordance with their membership interests.

8.3     Any Company gain or loss realized with respect to property, other than money, contributed to the Company by a Member shall be shared among the Members pursuant to Code Section 704(c) and regulations to be promulgated thereunder so as to take account of the difference between the Company basis and the fair market value of the property at the time of the contribution ("built-in gain or loss"). Such built-in gain or loss shall be allocated to the contributing Member upon the disposition of the property.

8.4     Nonrecourse deductions (as defined in Reg. §1.704-2(c)) shall be separately

allocated to and among the Members in proportion to their membership interests.

8.5     Notwithstanding anything to the contrary contained in this Article VIII, if, during any Company fiscal year, there is a net decrease in "minimum gain," as defined in Reg. §1.704-2(c), each Member shall be specially allocated items of income and gain for such year (and, if necessary, subsequent years) in an amount equal to the portion of such Member's share of the net decrease in minimum gain for the year, as determined in accordance with Reg. §1.704-2(g)(2). The items to be so allocated shall be determined in accordance with Reg. §1.704-2(f). This Paragraph is intended to comply with the minimum gain chargeback provisions of the Treasury Regulations under Code Sec. 704(b) and shall be interpreted and applied consistently therewith.

## ARTICLE IX

### Admission and Withdrawal of a Member

9.1     No Additional Member shall, while this Agreement is in force, sell, assign, encumber, pledge, transfer, or otherwise dispose of any membership interest of the Company now or hereafter owned by him except (i) with the prior written consent of the Managers, or (ii) pursuant to section 9.2 below.

9.2.    Right of First Refusal Provisions.

A.    In the event a Member desires to sell or transfer, by any means whatsoever, all or any portion of his membership interest (a "Selling Member"), to any Person other than the other Member or the Company, he may do so only upon the terms and conditions of this Article 9.2.

B.    The Selling Member must obtain or have received a written bona fide offer from an unrelated third party, acceptable to him, for the purchase of all of his

membership interest and providing for a per percentage point purchase price, payable in cash or promissory notes (hereafter "Purchase Offer").

C.     The Selling Member must promptly submit an exact and complete photocopy of the Purchase Offer to the other Member, which shall then have the option to a) purchase of all of the Selling Member's membership interest at the same per percentage point price and on the same terms and conditions as contained in the Purchase Offer, or b) take no action. The other Member shall have a period of thirty (30) days from the date of delivery of a copy of the Purchase Offer to it within which to notify the Selling Member if it elects to proceed as set forth in subsection (a) above.

D.     The right of first refusal set forth as alternative C(a) above shall be assignable by the other Member to the Company so that the Company may effect such purchase from the Selling Member, in which event the Selling Member covenants and agrees, at the request of the other Member, to cause those actions to be taken which will authorize and approve the Company's exercise of said right of first refusal and the Company's purchase of the Selling Member's membership interest.

E.     The rights of purchase and sale set forth in Article 9.2 shall be exercisable by the other Member by written notice thereof delivered to the Selling Member. In the event and to the extent the other Member (or the Company by assignment) does not exercise the right of purchase set forth in this Article 9.2, the Selling Member may sell its membership interest to the bona fide offeror but only in strict accordance with the terms and conditions and at the price set forth in the Purchase Offer and only within sixty (60) days after the thirty (30) day option period of the other Member referred to above shall have expired.

F.     Upon exercise of a right of purchase set forth as alternative C(a) above, the closing shall take place at the principal office of the Company no later than thirty (30) days after such exercise, the purchase price of the Selling Member's membership interest to be payable according to the payment terms contained in the Purchase Offer against delivery of a certificate(s) for the membership interest being purchased, properly endorsed for transfer.

G.     In the event any sale permitted under this Article 9.2 to the bona fide offeror shall not be made within the sixty (60) day time period provided for above, such transfer may not thereafter be made without the Selling Member obtaining a new Purchase Offer and again submitting said offer to the other Member as provided herein.

9.3.   Each person who becomes a Member in the Company, by becoming a Member, shall and does hereby ratify and agree to be bound by the terms and conditions of this Agreement.

## ARTICLE X

### Termination or Dissolution of Company

10.1.   The Company shall be terminated if (a) a majority in interest of the Members consent that the Company should be terminated and dissolved, or (b) the Company is dissolved pursuant to this Agreement.

10.2.   If the Company is dissolved, the owners of a majority in interest of the remaining Members may elect to reconstitute and continue the Company as a successor Company upon the same conditions as are set forth in this Agreement.  Any such election to continue the Company will not result in the creation of a new Company among the remaining Members, nor will such election require the amendment of this Agreement or the execution of an amended Agreement.

10.3.   Upon the termination and dissolution of the Company, the then Manager or Managers, if any, or, if there is no Manager, any person elected to perform such liquidation by the written consent of the owners of a majority in interest of the Members, shall proceed to the liquidation of the Company.  The proceeds of such liquidation shall be applied and distributed as follows:

A.   If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of the fair market value thereof, and any Member entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Members so entitled.  The fair market value of such assets shall be determined by an independent appraiser to be selected by the Company.  The amount by which the fair market value of any Property to be distributed in kind to the Members exceeds or is less than the basis of such Property, shall, to the extent not otherwise recognized by the Company, be taken into account in computing Net Profits or Net Losses (and shall be allocated among the Members in accordance with Section 8.2) for purposes of crediting or charging the Capital Accounts of, and liquidating distributions to, the Members under Section 10.3.B.

B.   All distributions upon liquidation of the Company shall be distributed to the Members in accordance with their positive capital account balances.

10.4.   Each of the Members shall be furnished with a statement, prepared by the Company, which shall set forth the assets and liabilities of the Company as of the date of

the Company's liquidation. Upon completion of the liquidation, the Managers shall execute and cause to be filed Articles of Dissolution of the Company and any and all other documents necessary with respect to termination of the Company.

## ARTICLE XI

### Books and Reports

11.1.   The Company shall maintain the following records:

A.   Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Company, shall be kept at the principal office of the Company. The fiscal year of the Company shall be the calendar year. The books of account of the Company shall be kept in accordance with sound accounting practices and principles applied in a consistent manner by the Company; provided, however, that all methods of accounting and treating particular transactions shall be in accordance with the methods of accounting employed for Federal income tax purposes. All determinations by the Managers with respect to the treatment of any item or its allocation for Federal, state or local tax purposes shall be binding upon all the Members unless the determination is inconsistent with any express provision of this Agreement.

B.   A current list of the full name and last known mailing address of each Member set forth in alphabetical order together with the contribution and share in profits and losses of each Member; a copy of the Articles of Organization of the Company and any amendments thereto; and a copy of this Operating Agreement and any amendments thereto.

C.   Any Member shall have the right from time to time at his expense to have his accountants and representatives examine and/or audit the books and records of the Company and the information referred to in this Section, and the Managers will make such books and records and information available for such examinations and/or audits.

11.2.   The Managers will cause to be sent to the Members within a reasonable period after the close of each year the following: (a) annual statements of the Company's gross receipts and operating expenses, and the capital accounts of each Member, prepared by the Company's independent public accountants, to be transmitted to each Member; and (b) a report to be transmitted to each Member indicating the Member's share of the Company's profit or loss for that year and the Member's allocable share of all items of income, gain, loss, deduction, and credit, for Federal income tax purposes.

11.3.   The Company shall maintain one or more bank accounts for the conduct of Company business as in the judgment of the Managers may be necessary from time to

time. The Managers shall execute such banking resolution forms as may be necessary from time to time to establish such accounts and shall designate one or more of the Managers as authorized signatories on banking instruments as the Managers may periodically determine.

## ARTICLE XII

### Tax Elections

12.1.   In the event of a transfer of a Member's interest, or upon the death of a Member, or in the event of the distribution of Company property to any party hereto, the Company may (but need not necessarily) file an election, in accordance with Section 754 of the Code to cause the basis of the Company Property to be adjusted for Federal income tax purposes, as provided by Sections 734 and 743 of the Code.

12.2.   The Managers may make other tax elections and deal with other tax matters of the Company as they deem desirable or necessary from time to time.

## ARTICLE XIII

### Dispute Resolution

13.1   **Resolution of Disputes**

Any and all disputes arising hereunder which cannot be amicably resolved among the Members or between the Members and the Company, as the case may be, shall be submitted to arbitration, to be decided by an arbitrator to be appointed by the American Arbitration Association in compliance with the rules and regulations of that Association then existing and as practiced in the City of Buffalo, New York. Said arbitration shall be held in the City of Buffalo, with all costs and expenses thereof, including attorneys' and accountants' fees, to be shared equally by the parties to the arbitration; provided, however, that the arbitrator shall have the power and authority to assess all or any other portion of the costs of said arbitration against any one or more parties in his sole discretion. All decisions of the arbitrator(s) hereunder shall be specifically enforceable in the appropriate courts of the State of New York having jurisdiction over the subject matter. Each Member consents to the personal jurisdiction of those courts and waive any defense based on lack of jurisdiction or improper venue

# ARTICLE XIV

## Miscellaneous

14.1    Any notice or other communication under this Agreement shall be in writing and shall
be considered given when mailed by registered or certified mail, return receipt requested, or delivered by overnight courier or other form of personal delivery, in each case with proof of delivery, to the parties at the following addresses (or at such other address as a party shall have previously specified by notice to the others as the address to which notice shall be given to him):

        If to the Company, to it in care of the Managers at the address of the Company.

        If to the Managers, to them at the address of the Company.

        If to any Member, to such Member at the address set forth on the books and records of the Company.

14.2    This Agreement contains a complete statement of all of the arrangements among the
parties with respect to the Company and cannot be changed or terminated orally or in any manner other than by a written agreement executed by all of the Members. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

14.3    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

14.4    If any provision of this Agreement, or the application thereof to any person or circumstance, shall for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other persons or circumstances shall not be affected, but rather shall be enforced to the extent permitted by law.

14.5    Irrespective of the place of execution or performance, this Agreement shall be governed
by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in the State of New York.

14.6    The captions, headings and table of contents in this Agreement are solely for convenience of reference and shall not affect its interpretation.

14.7    This Agreement may be executed in any number of counterparts, each of which shall be
an original but all of which shall be deemed to constitute a single document.

14.8    Whenever the context reasonably requires, references to "him" "his" and the like, shall
also be deemed to mean "she", "her," "it" or "its", it being the intention of the parties that the use of the male gender is for convenience only and is intended to be gender neutral. The singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

14.9    .The provisions of RIDER #1 attached hereto and made a part hereof are a part of this
Agreement and are herby incorporated herein by reference. In the event of any conflict between any provision of Rider #1 and the other portions of this Agreement, Rider #1 shall control.

         IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

WHITESTAR DEVELOPMENT CORPORATION

By: _____

INCREDIBLE INVESTMENTS LIMITED

By: _____
     Name : David Ho
     Title  : Director

## SCHEDULE A

List of Members initial capital contributions, names and addresses:

| Name and Address Interest (%) | Initial Capital Contribution | Membership |
|---|---|---|
| Whitestar Development Corporation 8080 Tonawanda Creek Road Clarence, New York 14051 | $51.00 | 51% |
| Incredible Investments Limited Units 1605-1616, 16/F, The Metropolis Tower, 10 Metropolis Drive, Hunghom, Kowloon, Hong Kong. | $49.00 | 49% |

RIDER #1

TO

OPERATING AGREEMENT

RE

ONE NIAGARA PLAZA, LLC

The following provisions shall be deemed a part of the above described Operating Agreement and deemed incorporated therein in full. In the event of any conflict between any provision of this Rider #1 and the other portions of this Agreement, Rider #1 shall control.

A.   Definitions:  For the purpose of this Rider #1, the following terms shall mean:

"Altissma" means Altissma Ltd.

"Altissma Mortgage" means that certain first mortgage on the Property in the principal amount of $3,500,000 securing the Altissma Note. The term Altissma Mortgage shall be deemed to also include all assignments of rents and other instruments related to the Altissma Note and which are intended to provide security for the repayment of the Altissma Note.

"Altissma Note" means the note secured by the Altissma Mortgage, which note is in the original principal amount of $3,500,000, which note has a current balance (including unpaid principal, accrued interest and other charges) on it of approximately $6,800,000 (the actual unpaid balance of the Altissma Note as of this date is herein referred to as the "Altissma Note Balance").

"Property" shall mean the real property consisting of the AquaFalls building and surrounding land at 360 Rainbow Boulevard South, Niagara Falls, New York.

"Reger" means Reger Investments Fund, Ltd.

"Reger Mortgage" means that certain note and mortgage on the Property held by Reger, which mortgage is junior and second in priority to the Altissma Mortgage.

"Whitestar Advances" means all cash advances heretofore and hereafter made from time to time by Whitestar directly to the Company, together with cash payments heretofore and hereafter made from time to time by Whitestar to third parties on behalf of the Company. Whitestar Advances may, but shall not be required to, be confirmed by one or more promissory notes of the Company executed in favor of Whitestar.

B.   Reger Mortgage Background.   Reger has previously commenced a mortgage foreclosure action of the Reger Mortgage, which foreclosure action has resulted in a

judgment in favor of Reger (the "Judgment"), pursuant to which Reger has initiated proceedings to sell the Property at auction. The auction (the "Auction") is scheduled to take place on or about November 29, 2004. The date on which such auction actually takes place is herein referred to as the "Auction Date".

C.      Transfer of Reger Mortgage to Company    Whitestar has acquired the Reger Mortgage and Judgment from Reger. On or before the Auction Date, Whitestar shall transfer the Reger Mortgage to the Company. Such transfer shall be considered and deemed a loan by Whitestar to the Company having an agreed upon value of Two Million One Hundred Thousand Dollars ($2,100,000). This loan is herein referred to as the "Reger Mortgage Loan"

D.      Auction – Property Not Acquired.   At the Auction, the Company shall attempt to acquire the Property by "bidding in" up to the amount owed on the Reger Mortgage. Such actions shall be taken on behalf of the Company by Frank Parlato, as the Company's sole Manager  In the event a third party bids more than this amount and acquires the Property at the Auction, all of the Auction proceeds received by the Company shall be the property of, and distributed to Whitestar, and the Members shall then cause the Company to be liquidated and dissolved.

E.      Auction – Property Acquired.   In the event the Property is acquired by the Company at the Auction the following provisions of this Rider shall apply.

        (i)        Until and unless the Members determine otherwise in accordance with Article IV of this Operating Agreement, Frank Parlato shall be the sole Manager of the Company; and all references in this Operating Agreement describing the rights, powers and authority of the "Managers" shall be seemed to refer to him in his capacity as the sole Manager of the Company

        (ii)       The Managers shall be entitled to cause the Company to borrow funds from time to time from Whitestar, on such terms and conditions as the Managers determine to be reasonable  all such borrowings to be Whitestar Advances for the purposes of this Agreement. In addition, at such time as determined by the Managers, the Company shall attempt to seek new mortgage financing on the Property. Such financing shall be obtained on such terms and conditions as the Managers determine. ILL shall cause Altissma to unconditionally subordinate the Altissma Mortgage to any and all liens of such new lender, and hereby represents and warrants to Whitestar that it has the power and authority to cause Altissma to do so. At the election of the Managers, the proceeds of such financing shall be used to repay to Whitestar the Reger Mortgage Loan and Whitestar Advances.

        (iii)      In connection with the management of the Company, and in addition to the authority conferred on the Managers pursuant to Article 5 of this Operating Agreement, the Members expressly acknowledge that the Managers shall have the full and exclusive right to control the day to day operations and business affairs of the Company, and to establish and pursue such short term and long term goals of the Company as the Managers may determine from time to time, it being the intention of the Members that this provisions shall be broadly

interpreted in favor of the Managers and that until and unless this section is specifically amended or altered in writing by all of the Members, that the Managers shall be entitled to take any and all actions with respect to the Property and the business of the Company that the Managers determine to be appropriate and in the Company's best interest, in each case without any further confirmation or approval of the Members.

(iv)   The Altissma Note Balance shall be deemed the entire amount owed to Altissma with respect to the Altissma Note, and no further accruals of interest or other charges shall be permitted with respect thereto.

(v)   Altissma has granted to Whitestar a collateral assignment in the Altissma Note and Altissma Mortgage to serve as collateral security for the repayment, to Whitestar, by the Company, of the Reger Mortgage Loan and all Whitestar Advances (the "Altissma Collateral Assignment"). Accordingly, the Company shall not make any payments to Altissma with respect to the Altissma Note or any collateral of the Altissma Note, at any time during which the Company owes to Whitestar any portion of the Reger Mortgage Loan or any Whitestar Advance.

(vi)   The Members expressly acknowledge and agree that the Managers may cause the Company to hire a third party management company to help the Company manage the Property. Such third party may be Whitestar or an affiliate of Whitestar, so long as the terms on which Whitestar or such affiliate are hired are not materially more favorable than those on which the Company could hire another company providing similar management services.

(vii)   At such time as the Company acquires title to the Property at the Auction, Whitestar shall be deemed to have transferred to IIL one percent point of its 51% ownership interest in the Company so that, effective as of such time, each of Whitestar and IIL shall own fifty percent of al of the membership interests of the Company. However, notwithstanding such transfer, (d) IIL hereby grants to Whitestar an irrevocable proxy to vote the IIL membership interest with respect to the election of Managers, it being the expressed understanding of IIL that Whitestar or Whitestar's designee shall have the sole right to elect the sole manager or managers of the Company, with the powers and authority granted by this Operating Agreement, including those listed in Section 5.4 and subsection E(iii) of this Rider.

WHITESTAR DEVELOPMENT CORPORATION

By:

INCREDIBLE INVESTMENTS LIMITED

By:
Name : David Ho
Title : Director

SANDY Y.K. TANG
Messrs. King & Company
Notary Public,
Hong Kong Special
Administrative Region

A2

# PROMISSORY NOTE

$1,400,000.00                    Buffalo, New York                    December 7, 2004

FOR VALUE RECEIVED, Whitestar Development Corporation, a domestic corporation with offices at 8080 Tonawanda Creek Road, Clarence, New York 14032 (the "Maker"), promises to pay to REGER INVESTMENT FUND LLLP, or order, (herein together with its successors and assigns, including each and every from time to time holder of this Note, called the "Holder"), at its office at 2730 Transit Road, West Seneca, New York, or such other place as the Holder may from time to time designate in writing, the principal sum of One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00) lawful money of the United States of America (the "Principal Sum"), in the following manner:

A.    Interest only payments on the outstanding Principal Sum, at the rate of seven percent (7%) per annum ("Stated Interest"), which payments shall commence on May 7, 2005 ("First Payment Date") and continue on the 7th day of each month thereafter to but not including December 7, 2005 (the "Maturity Date") at which time the outstanding Principal Sum and all accrued interest, late charges, expenses and penalties shall be due and payable.

B.    It is understood and agreed that no interest payment shall be due until the First Payment Date and that interest on the Principal Sum shall accrue from April 7, 2005.

C.    All interest calculations shall be based upon a 360-day year.

This note is secured by, *inter alia*, a collateral assignment of mortgage by Maker to Holder dated on or about the date hereof (the "Assignment").

IN THE EVENT that any payment due the Holder hereunder shall remain unpaid for the period of ten (10) days, a "late charge" not to exceed five percent (5.0%) of said payment may be charged by the Holder hereof for the purpose of handling such overdue payment.

During the term of this Note, the Maker shall have the option of paying the Principal Sum to the Holder in advance of the Maturity Date, in whole, at any time and from time to time. Upon any prepayment of the Principal Sum in whole, the Maker shall pay to the Holder all interest and expenses owing pursuant to this Note and remaining unpaid.

AND IT IS HEREBY expressly agreed that the whole of said Principal Sum, or any part thereof, secured by the Assignment given to secure this Note, shall, forthwith or thereafter, at the option of the Holder, become due and payable upon (i) the failure to pay the sums evidenced

BULIBO1\586695\1

hereby when due and payable or (ii) the happening of any of the events of default specified in the Assignment (each an "Event of Default") and that all of the covenants, agreements, terms and conditions of said Assignment are hereby incorporated herein with the same force and effect as if herein set forth at length.  Upon the happening of any such specified Event of Default and without further notice to Maker, the entire unpaid principal balance, at the option of Holder, shall become due and payable immediately with interest at a rate which is two percentage points per annum in excess of the Stated Interest rate herein above specified (but not in excess of the maximum rate allowed by law to be charged to the Maker); together with a reasonable attorneys' fee for collection; and payment of the same may be enforced and recovered by the entry of judgment on this Note and the issuance of execution thereon.   Notwithstanding anything contained in this Note or the Assignment to the contrary, Maker shall be entitled to written notice of any Event of Default and five (5) days to cure such default prior to the acceleration of the indebtedness evidenced hereby or the enforcement of any remedy.

THE REMEDIES of Holder provided in the Assignment and in any other instrument securing this Note shall be cumulative and concurrent, and may be pursued singly, successively or together against Maker, any guarantor(s) and/or the property described or referenced in the Assignment at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same.

THE HOLDER may, without notice and without releasing the liability of any party hereto, grant extensions or renewals hereof from time to time and for any term or terms, add or release one or more parties hereto, acquire additional security or release any security in whole or in part.  The Holder shall not be liable for or prejudiced by failure to collect or for lack of diligence in bringing suit on this Note or any renewal or extension hereof.

THE MAKER and all others who may become liable for the payment of all or any part of this obligation do hereby severally waive presentment for payment, demand, notice of demand, notice of non-payment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement with the payment of this Note.  Maker waives the benefit of any laws which now or hereafter might otherwise authorize the stay of any execution to be issued on any judgment recovered on this Note, or the exemption of any property from levy and sale thereunder.

IT COULD BE THAT the loan evidenced by this Note is subject to a law which sets maximum loan charges and that law if interpreted so that the interest and other fee and charges collected or to be collected in connection with the loan would exceed permitted limits, then: (a) any such interest or other loan fee or charge shall be reduced by the amount necessary to reduce the loan charge to the permitted limit; and (b) any sums already collected which exceeded permitted limits would be refunded by Maker.  The Holder may choose to make this refund by reducing the principal balance of this Note or by making a direct refund to Maker.

IN ANY ACTION OR OTHER LEGAL PROCEEDING, RELATING TO THIS NOTE, THE MAKER (1) CONSENTS TO THE PERSONAL JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK AND

(2) AGREES THAT IN ANY LEGAL PROCEEDING A COPY OF THIS NOTE KEPT IN THE HOLDER'S COURSE OF BUSINESS MAY BE ADMITTED INTO EVIDENCE AS AN ORIGINAL.

THE MAKER AND THE HOLDER EACH WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION IN CONNECTION WITH THIS NOTE.

THIS OBLIGATION is secured by a validly executed collateral Assignment of Mortgage covering certain mortgaged property situate in the County of Erie, State of New York, and other collateral.

WHITESTAR DEVELOPMENT CORPORATION

By: _____
     Frank Parlato, President

State of New York    )
                     )    ss:
County of Erie       )

On the 7th day of December in the year 2004 before me, the undersigned, a notary public in and for said state, personally appeared Frank Parlato, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals or the person upon behalf of which the individuals acted, executed the instrument.

_____
(Signature and office of individual taking acknowledgment)

VINCENT P. HAUBER
Notary Public State of New York
Qualified in Erie County
My Commission Expires June 30, 20__

BOOK 1 6 3 5 PAGE 0 8 4 5

## COLLATERAL ASSIGNMENT OF MORTGAGE

This "Collateral Assignment", made as of this 7th day of December, 2004, by and between Whitestar Development Corporation, a domestic corporation with offices at 8080 Tonawanda Creek Road, Clarence, New York 14032 (the "Assignor") in favor of Reger Investment Fund LLLP, a Florida limited liability partnership with offices at 2730 Transit Road, West Seneca, New York (the "Assignee").

### WITNESSETH:

A.     On even date herewith, Assignee has sold to Assignor and Assignor has purchased from Assignee, certain assets, the unpaid purchase price of which is $1, 400,000.00.

B.     Assignor's indebtedness to Assignee as described above and in connection with said purchase is evidenced by a Promissory Note executed and delivered by Assignor to Assignee dated the date hereof in the principal amount of $1,400,000.00 (said Promissory Note together with any renewals, modifications, amendments or replacements thereof being hereinafter collectively referred to as the "Note").

C.     To secure repayment of all Assignor's obligations to Assignee in connection with the Note (the "Indebtedness") as evidenced by the Note, Assignee requires, among other things, that Assignor collaterally assign and grant a security interest to Assignee all of Assignor's interest in  those certain mortgages and related agreements set forth on Schedule A attached hereto and made a part hereof (collectively, the "Mortgages") together with the debt or note referred to in said Mortgage and all permitted replacements, extensions renewals or obligations, now existing or hereafter incurred, which may be secured by said Mortgages (collectively the "360 Rainbow Notes").

NOW, THEREFORE, in consideration of Assignee's agreement to make the Loan and other  good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby collaterally assign, transfer, convey, deliver and set over unto the Assignee, its successors and assigns, all of Assignor's right, title and interest, now owned or hereafter acquire, in and to the Mortgages and the 360 Rainbow Notes to have and to hold unto the Assignee, its successors and assigns, for so long as there exists any Indebtedness owing from Assignor to Assignee; and does hereby agree as follows:

1.     Assignor agrees that the Mortgages will secure (i) the repayment of all Indebtedness, and (ii) performance and discharge of each and every term, covenant, condition and obligation of Assignor contained in the Note or any other instrument constituting security for the Note.

2.     Assignor hereby agrees to indemnify Assignee and to hold Assignee harmless from any liability, loss or damage which may or might be incurred by Assignee by reason of this Collateral Assignment, and from any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Mortgages.

BOOK 1635 PAGE 0846

3.    Assignor hereby warrants and represents to Assignee that (a) the Assignor has the legal authority to execute and deliver this Collateral Assignment and all other documents described herein or contemplated hereby (collectively "Loan Documents"), (b) the Assignor has taken all necessary action and obtained all necessary approvals in connection with this Collateral Assignment, and (c) this Collateral Assignment, when executed and delivered to Assignee, shall be a valid and binding obligation of the Assignor, enforceable against Assignor in accordance with its terms.

4.    For so long as Assignor is not in default under the Note, Assignor shall be permitted to collect and receive regularly scheduled payments of principal and interest under the 360 Rainbow Notes. Any payments received by Assignor under the 360 Rainbow Notes which are in excess of the regularly scheduled monthly installment shall be immediately forwarded and remitted by Assignor to Assignee on account of the Indebtedness and, pending receipt by the Assignee, shall be held in trust by Assignor for the benefit of the Assignee. Without notice, the right of Assignor to collect and receive regular payments under the 360 Rainbow Notes shall immediately and automatically terminate in the event that Assignor should fail to make payment to the Assignee when due under the Note. In such event, Assignee shall have the right to collect and receive all payments due under the 360 Rainbow Notes and the Mortgages, to collect and enforce the 360 Rainbow Notes and the Mortgages in accordance with the respective terms thereof, and to sell or otherwise dispose of the 360 Rainbow Notes and the Mortgages or to compromise or settle the obligations owing thereunder in such manner as the Assignor sees fit in its absolute discretion, without impairment of the Assignor's recourse against the Assignee for any deficiency balance that may exist after such sale, disposition, compromise or settlement.

5    Notwithstanding anything contained in this Collateral Assignment to the contrary, Assignor hereby reserves the right to require Assignee to enforce any remedies contained in the Mortgages as Assignor may so elect. In the event of such enforcement as described in the immediately preceding sentence, Assignor shall be responsible for and obligated to pay directly or by reimbursement to Assignee, any and all costs and expenses relating to the enforcement of remedies herein described, including, but not limited to, attorneys' fees.

6.    The breach of any warranty, covenant or representation in this Agreement, the Note, or any other agreement between Assignor and Assignee shall be an "Event of Default".

7.    In case of any conflict between any provision of this Collateral Assignment and any provision of any other agreement between Assignor and Assignee, the provision selected by Assignee in its sole and absolute discretion shall control and prevail.

8.    The terms "Assignor" and "Assignee" shall be construed to include the successors and permitted assigns thereof. The gender and number used in this Collateral Assignment are used as a reference term only and shall apply with the same effect whether the parties are of the masculine or feminine gender, corporate or other form, and the singular shall likewise include the plural.

9.    This instrument may not be amended, modified or changed, nor shall any waiver of any provision hereby be effective, except only by an instrument in writing and signed by the

BULIB01\586710\1

BOOK 1635 PAGE 0848

party against whom enforcement of any waiver, amendment, change, modification or discharge is sought.

IN WITNESS WHEREOF, this Collateral Assignment is made ~~on~~ *this 14th of April, 2006, as* the day and year first above written.

WHITESTAR DEVELOPMENT CORPORATION

By: _____
~~Frank Parlato, President~~

WHITESTAR DEVELOPMENT CORPORATION

By: _____
Frank Parlato, President

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF ERIE         )

On the ~~7th~~ *14th* day of ~~December~~ *April* in the year ~~2004~~ *2006* before me, the undersigned, a Notary Public in and for said State, personally appeared Frank Parlato, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

VINCENT P. HAUBER
Notary Public State of New York
Qualified in Erie County
~~My Commission Expires June 30, 20.~~ *OG*

_____
Notary Public

MICHAEL J. KREAMER
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN ERIE COUNTY
MY COMMISSION EXPIRES ___ 9/31/06

BULIB01\586710\1

BOOK 1 6 3 5 PAGE 0 8 4 7

## SCHEDULE A

1.  Mortgage in the amount of $3,500,000 and interest made by 360 Rainbow Associates, LLC to Hooker Niagara Office Corporation, dated June 24, 1999 and recorded in the Niagara County Clerk's Office on June 28, 1999 in Liber 3933 of Mortgages at Page 160, which Mortgage was assigned to Altissima, Ltd. by Assignment of Mortgage dated October 14, 2002 and recorded in the Niagara County Clerk's Office on October 25, 2002 in Liber 1451 of Assignments, Releases, etc. of Mortgages at Page 485.

2.  Assignment of Rents made by 360 Rainbow Associates, LLC to Hooker Niagara Office Corporation dated June 24, 1999 and recorded in the Niagara County Clerk's Office on June 28, 1999 in Liber 2937 of Deeds at Page 342, which Assignment of Rents was assigned to Altissima, Ltd. by Assignment dated October 14, 2002 and recorded in the Niagara County Clerk's Office on October 25, 2002 in Liber 3215 of Deeds at Page 881.

NOTE:  Above documents 1 and 2 were collaterally assigned by Altissima, Ltd. to Whitestar Development Corporation by Collateral Assignment of Mortgage and Rents dated *11-23-04* and recorded in the Niagara County Clerk's Office on or about December *7*, 2004 in Liber *1588* of Assignments at Page *979*

BULIB01\586710\1

BOOK 1635 PAGE 0849

## SECTION 275 AFFIDAVIT

STATE OF NEW YORK    )
COUNTY OF ERIE       )     SS:

The undersigned, being duly sworn, deposes and says that:

1.    He is the President of Whitestar Development Corporation ("Corp."), being the current collateral mortgagee in the mortgages listed in the "Assignment" (hereinafter defined).

2.    This affidavit is attached hereto and made a part of a certain collateral assignment of mortgage ("Assignment") dated on or about December 7, 2004 by Whitestar Development Corporation to Reger Investment Fund LLLP ("Assignee").

3.    The Assignee is not acting as a nominee of the mortgagor set forth in Schedule A to the Assignment or Corp.

4.    The mortgage(s) collaterally assigned by the Assignment to Assignee continue to secure a bona fide obligation.

5.    This affidavit is being given pursuant to and in connection with §275 of the New York Real Property Law.

_____
Frank Parlato

Sworn to before me this
19th day of ~~April,~~ July 2006.

_____
Notary Public
Qualified in Niagara County
Comm. Exps 4/30/08

BULIB01\656821\1

B

## LEASE AGREEMENT   *AMMENDMENT #1*

THIS LEASE AGREEMENT ("Agreement"), made this _14th_ day of _APRIL_ _____, 2006, is by and between ONE NIAGARA, LLC, a New York limited liability company with offices located at 360 Rainbow Boulevard South, Niagara Falls, New York 14303 (the "LANDLORD"), and TOURIST SERVICES, LLC, a New York limited liability company with offices located at 360 Rainbow Boulevard South, Niagara Falls, New York 14303 (the "TENANT").

LANDLORD owns certain undeveloped real property, located at 360 Rainbow Boulevard, Niagara Falls, New York, which property is more particularly described in Exhibit "A" attached hereto (the "Property"), and a building located adjacent to the Property (the "Building"), also described on Exhibit A.

Tenant seeks to develop the Property for a surface only parking lot and use a portion of the Building for an associated travel information and /or retail sale facility (the "Permitted Use").

TENANT wishes to lease the Property and the ground floor of the Building, together with all improvements now and hereafter erected thereon, and LANDLORD wishes to lease the Property and the ground floor of the Building to TENANT on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto, LANDLORD and TENANT agree as follows:

1.     Lease of the Property.  LANDLORD hereby leases to TENANT the following: (i) the Property as described in the recitals above and (ii) the ground floor of the Building, together with all rights of way, servitudes, licenses, tenements and appurtenances thereto, but reserving for LANDLORD for the benefit of Landlord's other tenants and guests to the Building an easement and right of way for ingress and egress through the "public areas" of the ground floor of the Building and Loading Dock (the Property and ground floor of the Building, collectively, the "Premises").  TENANT, without cost to LANDLORD, shall be permitted to construct facilities on the Premises consistent with the Permitted Use.  Any such construction to the Premises shall comply with applicable law and be performed in accordance with industry standards.

2.     Initial Term and Rental.  This Agreement shall be for an initial term of five (5) years commencing on the date hereof (the "Commencement Date"), at an annual rental equal to twenty-five (25%) percent of gross revenues (but less any sales or similar taxes collected by TENANT) generated by TENANT each year from its operations on the Property, to be paid in monthly installments, based on revenue calculations of TENANT for the preceding month, payable on the tenth (10th) day of each month during the term hereof, in arrears, to the LANDLORD or to such other person, firm or place as the LANDLORD may, from time to time, designate in writing at least sixty (60) days in advance of any rental payment date. LANDLORD

acknowledges that TENANT will be investing funds to develop the facility and that no rent shall be due until the tenth day of the month following the month in which TENANT first receives revenue from parking; *provided, however,* if TENANT has not commenced paying such rent on or before July 10, 2006, then TENANT shall pay a minimum rent payment to LANDLORD of $1,000 per month until parking revenues commence and rent payments based upon parking revenues begin to be paid. Rent shall be inclusive of all taxes on the Premises as set forth in Section 6 below, insurance on the Building as provided for in Section 7(b) below and utilities on the Premises as set forth in Section 8 below.

        3.     **Extension of Term.** TENANT shall have the option to extend the term of this Agreement for six (6) additional consecutive five (5) year periods on the same terms and conditions as the initial term. Each option for an extended term shall be deemed automatically exercised without notice by TENANT to LANDLORD unless TENANT gives LANDLORD written notice of its intention not to exercise any such extension option at least thirty (30) days prior to the end of the then current term. If TENANT gives LANDLORD written notice of its intention not to exercise any such option, the term of this Agreement shall expire at the end of the then current term. All references herein to the term of this Agreement shall include the term as it is extended from time to time as provided in this Agreement.

        4.     **Use.** TENANT shall use the Premises only for the Permitted Use.

        5.     **Governmental Approvals.** LANDLORD shall cooperate with TENANT in its effort to obtain and maintain in effect all certificates, permits, licenses and other approvals required by governmental authorities for TENANT's use of the Premises. In furtherance thereof, LANDLORD agrees to sign such papers as are required to file applications with the appropriate zoning authority and other governmental authorities for the proper zoning of the Premises and for other certificates, permits, licenses and approvals as are required for the use of the Premises as intended by TENANT. If for any reason TENANT is unable to use the Premises in the manner intended by Tenant as described in Section 4 above, TENANT shall have the right to terminate this Agreement by written notice to LANDLORD. Upon such termination, LANDLORD and TENANT shall have no other further obligations to each other.

        6.     **Taxes.** LANDLORD shall be responsible for preparing and filing any necessary returns for and paying any and all real property taxes, including assessments and municipal charges for the Premises and shall furnish TENANT with proof of payment within thirty (30) days after payment is due. If LANDLORD fails to timely pay the aforesaid taxes, TENANT may pay same and deduct the cost thereof from the next installment(s) of rent.

        7.     **Insurance.**

        (a)     During the term of this Agreement, TENANT shall carry, at its own expense, comprehensive general liability insurance with minimum limits of $1,000,000 for injury to or death of one or more persons in any one occurrence and $500,000 for damage to or destruction of properties in any one occurrence with respect to the Property. LANDLORD shall be named in said policy as an additional insured and shall be furnished with a certificate of insurance for said policy upon LANDLORD's request.

BUL{B01\655747\1}

(b)     During the term of this Agreement, LANDLORD shall carry and maintain for the benefit of the TENANT, at its own expense, comprehensive general liability insurance for with minimum limits of $1,000,000 for injury to or death of one or more persons in any one occurrence and $500,000 for damage to or destruction of properties in any one occurrence with respect to the Building.  TENANT shall be named in said policy as an additional insured and shall be furnished with a certificate of insurance for said policy upon TENANT's request.

8.     **Utilities.**  TENANT shall be solely responsible and promptly pay for, or reimburse LANDLORD for, all heat, water, gas, electricity or any other utility used or consumed in ground floor of the Building or on the Property. LANDLORD shall separately meter or otherwise assure that TENANT is not paying for utilities consumed in other parts of the Building.

9.     **Additional Expenses & Credits.**  In the event the leased Premises are or become subject to any municipal fee or assessment attributable to the Term hereof ("Municipal Charges"), TENANT shall be responsible for paying all Municipal Charges, but an amount equal to one-half of such Municipal Charges shall be credited against the next installment(s) of rent becoming due hereunder.

10.     **Indemnification.**

(a)     TENANT shall indemnify and hold LANDLORD harmless against any liability or loss from personal injury or property damage resulting from or arising out of the use or occupancy of the Property by TENANT or its employees or agents, excepting, however, such liabilities and losses as may be due to or caused by the acts or omissions of LANDLORD or its employees or agents.

(b)     LANDLORD shall indemnify and hold TENANT harmless against any liability or loss from personal injury or property damage resulting from or arising out of the use or occupancy of the Property by LANDLORD or its employees or agents, excepting, however, such liabilities and losses as may be due to or caused by the acts or omissions of TENANT or its employees or agents.

11.     **Sale of Property.**   If LANDLORD, at any time during the initial or any extended term of this Agreement, decides to sell, subdivide or rezone any of the Property to a purchaser other than TENANT, LANDLORD shall promptly notify TENANT in writing, and such sale, subdivision or rezoning shall be subject to this Agreement and TENANT's rights hereunder, such rights constituting covenants that run with the land.

12.     **Quiet Enjoyment.**  LANDLORD covenants that TENANT, on paying the rental and performing the covenants, terms and conditions required of TENANT contained herein, shall peaceably and quietly have, hold and enjoy the Property and the leasehold estate granted to TENANT by virtue of this Agreement.

13.     **Notices.**  Except as otherwise provided herein, any notices or demands

BULIB01\655747\1

which are required by law or provided under the terms of this Agreement shall be given or made by LANDLORD or TENANT in writing and shall be sent to the addresses listed below:

If to LANDLORD:  One Niagara, LLC
360 Rainbow Boulevard South
Niagara Falls, New York 14303

If to TENANT:  c/o 2730 Transit Road
West Seneca, New York 14225
Attn: Gordon Reger

With Copy to:  Hiscock & Barclay LLP
1100 M&T Center
3 Fountain Plaza
Buffalo, New York 14203-1414
Attn: Richard J. Day, Esq.

14.  **Termination**. Notwithstanding any other termination rights available to TENANT under this Agreement, TENANT, at its sole and absolute discretion, shall have the right to terminate this Agreement with ninety (90) days prior written notice to LANDLORD.

15.  **Removal of Improvements**. Title to all improvements constructed or installed by TENANT on the Property shall remain with TENANT, and all improvements constructed or installed by TENANT shall at all times be and remain the property of TENANT, unless and to the extent such improvements constitute fixtures and are intended to remain a part of the Property, in which case, such improvements shall become and remain the property of the LANDLORD as of the end of the term. Furthermore, all improvements constructed or installed by TENANT that are not fixtures shall be removable by TENANT, at its option, at the expiration or earlier termination of this Agreement, provided TENANT shall not at such time be in default under any covenant or agreement contained in this Agreement.

16.  **Memorandum of Agreement**. TENANT, at its option, shall at any time during the term herein, have the right to record a memorandum or short form of this Agreement, setting forth a description of the Property being leased hereunder, the term of this Agreement and other information desired by TENANT for the purpose of giving public notice thereof to third parties. LANDLORD, at the request of TENANT, shall cooperate with TENANT to effectuate any such recording.

17.  **Governing Law**. This Agreement shall be governed and interpreted by, and construed in accordance with, the laws of the State of New York.

18.  **Binding Effect**. This Agreement shall extend to and bind the heirs, personal representatives, successors, and assigns of LANDLORD and TENANT and shall

BULIB01\655747\1

constitute covenants running with the land.

        IN WITNESS WHEREOF, the parties have executed this Lease Agreement as of the day and year first above written.

LANDLORD:

ONE NIAGARA, LLC, by its
Managing Member

By:
Name    Frank Parlato
Title    President, Whitestar Development Corp.

TENANT:

TOURIST SERVICES, LLC

By:
Name    Frank Parlato
Title    Member

By:
Name:    GORDON ROLEE
Title:    MANAGER OF RGMM LLC AS
        MANAGER OF RH NIAGARA BUILDING LLC

BUF1B01\6557471

EXHIBIT A

Property Survey



17

AMENDMENT #1
TO
LEASE AGREEMENT
BETWEEN
ONE NIAGARA LLC
AND
TOURIST SERVICES, LLC

This Amendment #1 to the Lease Agreement between One Niagara, LLC ("Landlord") and Tourist Services LLC ("Tenant") shall be effective June 11, 2007.

WHEREAS, reference is made to that certain Lease Agreement (the "Lease") made April _____, 2006 by and between Landlord and Tenant, pursuant to which Tenant has leased portions of the property owned by Landlord located at 360 Rainbow Boulevard, Niagara Falls, New York for use by Tenant for developing a parking lot and associated tourist facilities; and

WHEREAS, Tenant desires to also lease the ninth floor of the Building referred to in the Lease to develop an observation area (and related souvenir shop) (the "Observation Area") from which tourists and other persons will be able to view the Niagara Falls area; and

WHEREAS, Landlord and Tenant believe that the Observation Area will increase the use of the Property for parking (as already contemplated by the Lease) and result in increased Rent to be paid to Landlord as a result thereof; and

WHEREAS, Landlord and Tenant therefore desire to enter into this Amendment to confirm the following agreements, terms and conditions related to the ninth floor of the Building to Tenant.

NOW THEREFORE, in consideration of the foregoing, and other good and valuable consideration the receipt of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.  Effective immediately, Section 1 of the Lease is hereby amended by adding to the Premises the ninth floor of the Building, which Tenant shall be entitled to use for the development and operation of the Observation Area.

2.  Tenant and its guests and invitees shall have regular and unrestricted access to the ninth floor by means of the elevators and other means of ingress and egress generally made available to visitors to the Building. Landlord shall continue to have non exclusive access to the elevators, stairwells and mechanical rooms.

3.  Tenant shall pay for utilities consumed on the ninth floor in a manner provided for by section 8 of the Lease.

4.  Tenant shall have the right to make such improvements to the ninth floor as may be necessary in order for the Observation Area to be constructed and operated. At the end of the Term such improvements (other than personal property which may be

BUL1B01\70335712

R00099

Jul 16 2009 10.29AM                                        No. 2373   P. 3

removed by the Tenant) shall become the property of Landlord. Tenant shall maintain the improvements it makes to the ninth floor. Landlord shall otherwise maintain the ninth floor and the Building so that it shall be continuously useable by Tenant for the purpose of operating the Observation Area during (i) such periods that Tenant operates the first floor area of the Premises and (ii) for such other periods as Tenant desires for use as an observation area in connection with local or special events for which Tenant may desire to use the Observation Area as an observation area or otherwise

5.     Except as herein amended, the Lease Agreement remains in full force and effect in accordance with its terms.

One Niagara, LLC

By:

CONFIDENTIAL

Tourist Services LLC

By:

*Manager of Reman, LLC as Manager of Rit Niagara Building LLC*

BULIDO\V033572                    - 2 -                         n00658